**PLANNED PARENTHOOD ASSOCI-ATION/CHICAGO AREA, Plaintiff,**

**v.**

**CHICAGO TRANSIT AUTHORITY, et al., Defendants.**

No. 84 C 4976.

United States District Court, N.D. Illinois, E.D.

Aug. 9, 1984.

Alan S. Gilbert, Sheila Hegy Swanson, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiff.

George J. Murtaugh, Jr., Chicago, Ill., for defendant Winston Network, Inc.

Richard W. Burke, Stephen C. Voris, Burke, Griffin, Chomicz & Wienke, P.C., Chicago, Ill., Edward J. Egan, Chicago, Ill., for defendants Chicago Transit Authority.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

Planned Parenthood Association/Chicago Area ("PPA") sues the Chicago Transit Authority ("CTA"), its governing body Chicago Transit Board ("Board"),[1] its Executive Director Bernard J. Ford ("Ford") and its former Public Affairs Director Michael Horowitz ("Horowitz")[2] and Winston Network, Inc. ("Winston") under 42 U.S.C. §§ 1983, 1985(3) and 1986. PPA charges violation of its First and Fourteenth Amendment rights[3] by defendants' refusal to accept PPA's advertising for display on CTA buses, trains and facilities. PPA has requested both injunctive relief and damages.

In accordance with Fed.R.Civ.P. 52(a) this Court finds the facts as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions").[4] By agreement of the parties, in accordance with Rule 65(a)(2) the trial of this action on the merits has been advanced and consolidated with the hearing of PPA's application for a preliminary injunction, with the issue of damages deferred for a later hearing. Accordingly these Findings and Conclusions serve as this Court's final determination as to injunctive relief.

### Findings of Fact

*Parties*

1. PPA is an Illinois not-for-profit corporation affiliated with Planned Parenthood Federation of America. PPA provides educational, counseling, referral and medical services related to family planning and medically-approved birth control through four clinics in Chicago and one clinic in a Chicago suburb (Tr. 21–22).

2. CTA is a municipal corporation, created by the Illinois General Assembly, which owns and operates a transit system serving the public in metropolitan Chicago (CTA Ans. ¶ 5).

3. Board's Members (see n. 1) are appointed by the Mayor of the City of Chicago and the Governor of Illinois. Board governs and administers CTA through its members and agents (CTA Ans. ¶ 6).

4. Winston, which does business in Illinois and has an office in Chicago, is a private corporation engaged in the transit and outdoor advertising business. It has an exclusive contract with CTA (the "Contract," CTA Ex. 47) to place cards, signs and other forms of advertising in or on

---

1. Members of the Board are also named defendants: Chairman Michael Cardilli ("Cardilli") and members Nick Ruggiero, John Hoellen, Howard C. Medley, Michael Brady, James P. Gallagher and Jordan Jay Hillman ("Hillman").

2. For convenience, "CTA" will also be used to refer to both CTA itself and all its affiliated defendants where appropriate in the context of these Findings and Conclusions.

3. Following conventional usage, these Conclusions will refer to the First Amendment even though (state action being involved) the constitutional provision at issue is really the Fourteenth Amendment (with its incorporation of the First's principles).

4. To the extent if any the Findings as stated reflect legal conclusions, they shall be deemed Conclusions. To the extent if any the Conclusions as stated reflect factual findings, they shall be deemed Findings.

buses, rapid transit cars and other CTA property (Winston Ans. ¶ 11).

*Sale of CTA Advertising Space*

5. Winston, acting under the Contract, sells or leases space in and on CTA buses and transit cars and other CTA property for the display of cards and signs containing messages (Winston Ans. ¶ 12; Tr. 63; CTA Ex. 47). Only Contract ¶ 8 contains any restriction on the type of advertising Winston can accept for placement on CTA property:

> All advertising displays ... shall be of reputable character, and if any immoral, vulgar or disreputable advertisements are ... placed ..., [Winston] shall remove the same immediately ...

6. CTA did not expressly reserve authority in the Contract to review or to approve requests to advertise or the messages themselves before their posting on CTA property. However, it has been the long-standing practice for CTA to review and approve messages submitted by not-for-profit organizations before posting of those messages on CTA property (Tr. 75, 96, 103, 110; CTA Ex. 7). It is *not* however standard practice for CTA to review or to approve, before their posting on CTA property, commercial or political candidate messages or other message for which full rates are paid. Such messages are routinely approved or disapproved by Winston sales account executives based upon the creditworthiness of the advertiser and the sales account executive's subjective judgment about the contents of the message (Tr. 72–72, 104; Sullivan Dep. 41–42, 46; Dyson Dep. 21–26). On no occasion has CTA reviewed or approved political candidates' messages before their posting on

CTA property. In the few instances where Winston has referred commercial messages to CTA for prior review or approval, in Winston's view the messages raised questions of vulgarity, immorality or legality (CTA Exs. 7, 10, 11, 31, 48, 49).

7. By the literal terms of the Contract, CTA, Board and all other CTA-affiliated defendants delegated to Winston the authority to accept or reject requests for CTA display space without any review by CTA or any objective guidelines for such acceptance or rejection (Tr. 70–71, 80–81; CTA Ex. 47). At least in those instances where Winston obtains CTA review for an advertising request, Winston acts as CTA's agent (Tr. 24, 63–65, 70–72, 75–81, 106).[5]

8. CTA has displayed cards and signs (PPA Group Exs. 1 and 2) advertising, and communicating with the public as to:

(a) a wide variety of products and services, including health care, cigarettes, liquor, and lawyers' and doctors' services;

(b) political candidates;

(c) gun registration;

(d) draft registration;

(e) arms control;

(f) prevention and cure of disease (including AIDS);

(g) labor unions for county and city workers;

(h) religious organizations;

(i) non-discrimination in employment;

(j) tenants' rights;

(k) military service;

(*l*) sexually suggestive calendars and magazines;

(m) public figures;[6] and

(n) fortune telling.

---

5. See n. 15.

6. PPA calls particular attention to an advertisement (PPA Ex. 57) featuring Minister Louis Farrakhan. In fairness to CTA, that poster plainly antedated by at least a few months Rev. Farrakhan's emergence from comparative obscurity (at least in any major public sense) into national notoriety as a controversial figure. And that timing issue (under which the poster was non-controversial when accepted) is not blunted by the fact the poster remained on display at the time of the hearing in this case, some four months after the February 26, 1984 event advertised by the poster. Surely CTA cannot, in real world terms, be held liable for not policing all its advertisements on a continuing basis to avoid any later-arising potential controversy of this type.

*PPA's Requests for CTA Advertising Space*

9. Since early 1983 PPA has sought to advertise its services [7] by purchasing or leasing display space on CTA property designated for public messages, including but not limited to the interior of CTA buses and transit cars (Tr. 24, 31–32, 47–50, 54–60; PPA Exs. 7, 8). In January 1983 Barbara Shaw ("Shaw"), PPA's Public Information Coordinator, called CTA to request information about how to purchase message space on CTA (Tr. 21, 24–25). CTA referred Shaw to Winston (Tr. 24). Shaw phoned Winston and spoke with Jay Dyson ("Dyson"), a Winston sales account executive (Tr. 25, 63–64). Shaw told Dyson PPA wanted to lease message space from CTA. Dyson suggested to Shaw that PPA could obtain message space at a reduced rate because it was a not-for-profit organization and told Shaw to submit a sample of the copy of the message PPA wanted to place (Tr. 25–26, 67; Dyson Dep. 13).

10. As requested, Shaw submitted the text of PPA's proposed message to Dyson, who forwarded it to Jack Sullivan ("Sullivan"), Winston's liaison with CTA (Tr. 27, 67, 75; PPA Ex. 6). Dyson routinely submits to Sullivan proposals for messages from not-for-profit organizations entitled to reduced rates (Tr. 65; Dyson Dep. 15, 26).

11. Sullivan told Dyson he would have to get approval from CTA for the PPA message (Tr. 68; Dyson Dep. 33; Sullivan Dep. 17). Sullivan routinely submits public service or not-for-profit messages to CTA for approval when Sullivan feels those messages may be "controversial" or "not liked" by CTA. Sullivan does not submit messages for approval that he thinks are "non-controversial" or are of a type previously approved by CTA. Sullivan bases these determinations upon his "own feelings" and his experience with CTA (Tr. 75–76, 80–81; Sullivan Dep. 13–15, 38–39, 44).

12. In late January 1983 Sullivan told Dyson Horowitz had rejected PPA's request to advertise (Tr. 69–70). Dyson in turn informed Shaw and PPA's Acting Director of Community Affairs Michael Seiler ("Seiler") of CTA's rejection. Dyson told Seiler to communicate with Horowitz if he wished to pursue the matter further (Tr. 47, 70; Dyson Dep. 36–37). Between February and July 1983 Seiler unsuccessfully attempted to reach Horowitz, who never returned Seiler's numerous calls (Tr. 48–50).

13. On March 14, 1983 PPA Executive Director Norman Levine ("Levine") wrote Horowitz a letter repeating PPA's request to obtain message space, attaching a copy of the same proposed text that Shaw sent Winston. Levine never received a response to that request (Tr. 52–53; PPA Exs. 6, 7).

14. In the late summer or early fall of 1983 Horowitz went to Ford to discuss with him PPA's desire to advertise on CTA (Tr. 126). Horowitz told Ford he was going to reject the message, and Ford concurred that the message should be rejected (Tr. 126). Ford then told Cardilli of the conversation with Horowitz and of Horowitz's intention to reject the message (Tr. 126).

15. On November 29, 1983 PPA's Director of Community Services Brenda Hansen ("Hansen") wrote Winston, again requesting space for PPA's message and attaching a copy of the proposed advertisement (Tr. 56–57; PPA Exs. 8–9). Sullivan received Hansen's letter and proposed advertisement and forwarded them to CTA (Tr. 106). William Baxa ("Baxa"), Horowitz's replacement as CTA Public Affairs Director, received Hansen's letter and proposed advertisement and referred them to Ford (Tr. 115) with a memo seeking Ford's advice on whether to accept or reject PPA's message (Tr. 115; PPA Ex. 15). On December 7, 1983 Ford instructed Baxa to reject PPA's message (PPA Ex. 15; Tr. 130–31).

16. Later in December 1983 Cardilli wrote a memorandum to Board's members, informing them of PPA's continuing request to purchase or lease message space.

---

7. PPA has determined CTA advertising is the most effective medium for PPA to reach its primary clientele, working women between the ages of 18 and 35 (Tr. 24). That determination is based on a good faith and reasonable belief, there being no evidence at all to the contrary.

Cardilli also told them of CTA's then-current practice of declining messages that advocated either pro- or anti-abortion positions and asked for their review and thoughts on the issue. Cardilli attached to his memorandum copies of Hansen's November 29, 1983 letter and the proposed advertisement (PPA Ex. 16). On January 4, 1984 Board discussed PPA's request. Board members Cardilli, Ruggierio, Medley, Hoellen and Hillman and seven CTA staff members, including R.F. Bartkowicz, J.O. Demaret and Ford, were present at that meeting. Board agreed to reject PPA's message attached to Hansen's November 29, 1983 letter to Sullivan (CTA Ans. ¶ 30).

17. On May 9, 1984 PPA's attorneys wrote Cardilli a letter advising CTA of PPA's repeated unsuccessful attempts to obtain display space. PPA's attorneys requested a prompt response as to whether CTA would allow PPA to obtain space and, if so, how PPA should do so (First Amended Complaint ¶ 28, Ex. D; CTA Ans. ¶ 28). CTA did not respond to the May 9, 1984 letter (CTA Response to Plaintiff's Request for Admissions 16).

*CTA's Claimed Justifications for Rejecting PPA's Advertisements*

18. CTA contends it rejected PPA's messages by applying CTA's alleged "long-standing, consistently enforced policy … to reject controversial public issue advertisements"[8] (CTA Ans. and Affirmative Defenses ¶ 34). But that purported policy of rejecting controversial public issue messages is neither "long-standing" nor "con-

sistently enforced." In the form now advertised by CTA, it is really nonexistent and has been contrived for this action. It has never been written and no guidelines exist for its application (Tr. 70–71, 80–81, 110–11, 126–27, 158–59, 233; Ford Dep. 68). It is vague, lacks precision and has been articulated differently by different CTA and Winston officers and employees (Tr. 114, 127–28, 158–59, 161, 233).[9] It is really not a "policy" at all, and in the various forms described by the witnesses it allows individuals at CTA and Winston to make purely subjective decisions as to what advertising to accept or reject (Tr. 162–63, 229; Ford Dep. 68–70).

19. CTA's purported policy of rejecting controversial public issue messages has been selectively applied in an arbitrary, capricious and invidiously discriminatory manner (Tr. 103–05, 127–31, 162–67, 233–38). CTA has applied the claimed policy to reject messages that relate to only one subject matter: the so-called "abortion issue" (Tr. 233–39; Dyson Dep. 51; Ford Dep. 19, 57).[10]

20. Neither CTA nor Winston has screened or rejected any commercial or political candidate messages on the basis that those messages were "controversial" (Tr. 65–66, 103–05, 168). Commercial messages accepted and posted in CTA locations without screening for "controversiality" include various messages for health-related services that are similar to the messages PPA wishes to post (PPA Group Exs. 1, 2).

---

8. Defendants have not attempted to justify their rejection of PPA's advertisement as prohibited by Contract ¶ 8.

9. In his testimony Cardilli muddied the waters somewhat further by using the term "issue-oriented" in contrast to "controversial." For example he characterized gun control as "issue-oriented" but not "controversial." Whatever semantic validity that distinction may have, the findings in the text would be equally valid if they spoke in terms of the former rather than the latter standard.

10. Even on the "abortion issue" CTA has some difficulty in elevating the sporadic responses of its staff over the years to the level of any established CTA "policy." Though Baxa's letter of

August 2, 1973 (CTA Ex. 2) rejecting an advertisement did reflect a statement from Board's then Chairman (Tr. 120, 131), it is not at all clear the subject was reviewed by Board members between that date and the current controversy. For example, Hillman was the only Board member other than Cardilli who testified, and he was wholly unaware of the claimed policy until Board's January 1984 meeting dealing with the PPA request (Tr. 224). For current purposes, however, CTA will be given the benefit of the (major) doubt by treating the rejection of abortion-related advertising from time to time as if it were an established and ongoing "policy."

21. CTA has accepted and posted in its vehicles and on its property numerous messages that could be considered "controversial" by many viewers, in precisely the same sense messages relating to the "abortion issue" might be considered controversial. Similarly CTA has accepted messages from persons and groups as "controversial" as PPA. Without any effort to be exhaustive, the record includes messages espousing views on nuclear war posted by anti-war groups; sectarian religious messages (see, e.g., PPA Group Exs. 1(a), 1(b), 2(a), 2(b) and 2(d)); sexually suggestive messages (see, generally, PPA Group Exs. 1, 2); a gun control message (PPA Group Ex. 1(c)); a selective service registration message (PPA Group Ex. 2(c)); a wide variety of partisan political candidate messages (see, generally, PPA Group Ex. 2); cigarette and alcohol beverages messages; messages regarding "AIDS," a disease that mainly affects homosexual males; messages for fortune tellers; and messages for various trade unions. CTA has admitted such messages fall within its characterization of what constitutes a "controversial" public issue message (Tr. 167–71, 235–37).

22. CTA contends it has applied its purported policy of rejecting all controversial public issue messages by rejecting all messages relating to the so-called "abortion issue." But that is clearly not true. CTA has accepted and posted messages from other family planning organizations, including the Illinois Family Planning Council, a not-for-profit organization that provided funds to PPA and operated a telephone service for women seeking family planning help (PPA Group Ex. 1(d); Tr. 256–57). CTA regularly accepts and posts messages for hospitals and medical clinics without ascertaining whether the speakers' services include abortions or abortion referrals.

For example in 1978 CTA accepted and posted a message for the Albany Women's Medical Center Health Care Services without ascertaining whether its services included abortion or abortion referral. When an anti-abortion group later complained on the basis that the Center conducted abortion referrals, CTA justified the acceptance of the message on the ground that "the copy does not read Abortion Clinic" (Tr. 103–05, 113; Cardilli Dep. 160; PPA Ex. 10). Then it removed the message.[11]

23. Before rejecting PPA's messages, CTA's officers and employees made no attempt to ascertain what services PPA provided, but rather relied on such vague information as "just a general feeling from the riding public" and "general knowledge of the world" (Tr. 129, 162; Ford Dep. 69–72). PPA's first proposed message did not include the word "abortion" (PPA Ex. 6), and CTA rejected Hansen's request despite CTA's understanding at the time that PPA was then willing to delete the word "abortion" from its messages (PPA Ex. 16). When CTA rejected PPA's requests, CTA did not know whether PPA referred persons for abortions or performed abortions as part of its services. Indeed Ford, who made the decision, believed at the time PPA did not perform abortions (Tr. 129–30; Ford Dep. 69–72).[12]

24. CTA's rejection of PPA's proposed advertisement was based solely on the content of the proposed advertisement and the identity of the speaker (CTA Response to Plaintiff's First Request for Admissions 20–22). CTA would not have accepted PPA's request for advertising space even if PPA would have been willing to pay full commercial rates for the space (Cardilli Dep. 160; Sullivan Dep. 93–94).

25. CTA's currently stated reasons for its claimed no-abortion-issue rule are that

---

**11.** Nor will it do for CTA to say it *intended* to apply even the asserted "abortion issue" policy uniformly, failing to do so only by mistake. One of the vices of an unformulated, unpromulgated and undefined "policy" is its potential for just such uneven enforcement, posing potential Equal Protection Clause problems. As n. 19 reflects, these Findings and Conclusions need

not resolve the validity of PPA's equal protection claims.

**12.** At the time PPA's messages were rejected, PPA did not perform abortions. PPA now does so, but abortion and abortion referral services are a small part of its services (Tr. 22–23).

acceptance of such messages would cause administrative disruption, discomfort to riders, protests, loss of revenues and other adverse effects upon CTA or its riders (Tr. 135–37, 162–65, 225–26, 239; Cardilli Dep. 78).[13] CTA's evidence on those issues was entirely speculative and cannot be credited. Hillman's "parade of horribles" in his discursive testimony was based not upon any objective facts cr circumstances but only upon his wholly subjective and unfounded beliefs (Tr. 128, 225–28, 231). CTA acknowledges there have been numerous issue-oriented protests at Board meetings, but none of them has ever involved a message posted on CTA (Tr. 128). At the time CTA decided to reject PPA's advertisement it had never received any threats of violence to CTA employees or property because of the proposed posting of messages on that subject (Cardilli Dep. 78). Since this lawsuit was filed, CTA has received letters against allowing PPA advertisements (CTA Ex. 58).[14]

26. Testimony of persons connected with transit system advertising in other large cities show no adverse effect from abortion-related advertising on those cities' transit systems, with the minor exception of graffiti on some signs (Milwaukee County Transit System Marketing Director Joseph A. Caruso Dep. 8–10; Transit America Advertising Division General Manager (covering Boston, Rochester, New York and Detroit) Robert R. Meara Dep. 8–12; Planned Parenthood of New York City Executive Director Alfred F. Moran Dep. 11–12, 22–22A; Planned Parenthood of Los Angeles Executive Direcъor John H. Anwyl Dep. 11–14, 18–20; Planned Parenthood of Southeastern Pennsylvania Associate Director of Development and Director of Corporate and Foundation Campaigns Ellen Ehrlich Dep. 12–18). Not only does that evidence belie the speculative CTA contentions, but the record reflects no efforts whatever by CTA to learn the experience of other major-city transportation systems on the subject. Regrettably, of course, testimony like Hillman's and Cardilli's may tend to be self-fulfilling and tend to enhance the likelihood of tensions, conflicts and other adverse effects if CTA is required to carry PPA's messages.

27. Each of the defendants participated or acquiesced in the decisions to reject PPA's request for CTA display space (Tr. 70, 115, 149, 163; PPA Exs. 15, 17). In CTA's refusal to sell PPA space for its display cards, each of the defendants acted within the scope of his or its authority or employment and under color of state law (CTA Ans. ¶ 39; Winston Ans. ¶ 39; CTA Ex. 47). All actions taken by the individual

---

**13.** CTA also fears acceptance of PPA ads would require posting of "pro-life" organizations' graphic depictions of aborted fetuses (CTA Exs. 54–57). Whether CTA could decline to allow advertising conducted in that *manner* is not an issue before this Court and need not be decided at this time. See generally *Clark v. Community for Creative Non-Violence*, —— U.S. ——, ——, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (U.S.1984).

**14.** One of those letters was a "Dear Bill" letter to CTA's Manager of Public Affairs Baxa from Executive Director Joseph Scheidler ("Scheidler") of the Pro-Life Action League (CTA Ex. 52), enclosing (obviously for in terrorem purposes) proposed ads including *photographs* of aborted fetuses and fetal matter, and insisting those ads would have to be run "unaltered," side by side with PPA's messages. In the course of his letter Scheidler said:

> My reading from what has transpired so far is that Judge Shadur will in fact come out in favor of Planned Parenthood's demand. We came up against Shadur once before and he

sided with PP in the Westchester controversy [a prior lawsuit assigned to this Court, in which the officials of a suburban community had blocked PPA's access to rented premises because of opposition to its views], as you know. We think he's in their pocket, so to speak, with all his high sounding talk about the First Amendment being violated if you don't put up their signs.

That last sentence is both scurrilous and (of course) false. Apparently the fervency of Scheidler's beliefs blinds him to the realization courts (including this one) decide matters based on principles, not persons. Were Scheidler or his organization the plaintiffs here, seeking entree to CTA for a message comparable to PPA's, the result would have been precisely the same. Whatever the personal views of a judge on the underlying topic may be is a total irrelevancy, for even in disagreement the judge must say with Voltaire:

> I disapprove of what you say, but I will defend to the death your right to say it.

defendants represent the current official policy of CTA and Board and were undertaken pursuant to and in execution of a current policy and practice of CTA and Board (Winston Ans. ¶ 40; CTA Ans. ¶ 40).

28. In refusing to sell or lease PPA space for its display cards, CTA acted in knowing and intentional or reckless disregard of the constitutional rights of both PPA and the potential viewers of PPA's display cards (PPA Exs. 11, 17; Tr. 114–15).

29. PPA provides information important for persons to make informed decisions about procreation, contraception and other personal matters. Given PPA's reasonable belief as to the importance of access to CTA advertising in that respect (see n. 7), PPA has suffered and will continue to suffer irreparable injury because of CTA's refusal to allow PPA to present its messages on CTA vehicles.

### Conclusions of Law

1. This Court has jurisdiction of this action under 28 U.S.C. § 1343. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391.

■ 2. PPA is a "person" within the meaning of 42 U.S.C. § 1983 ("Section 1983").

■ 3. Liability for a violation of Section 1983 extends to all Board members and all other CTA-affiliated individual defendants, because all admit to having acted within the scope of their employment or authority and "under color of state law" in rejecting PPA's messages.

■ 4. CTA is liable under Section 1983 because it is a municipal corporation that acted directly, under a current municipal policy, custom or practice, to cause the rejection of PPA's messages. *Monell v.*

*Department of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

■ 5. Winston is liable under Section 1983 (at least for injunctive purposes) because it acted as an agent of CTA and Board when it rejected or participated in the rejection of PPA's messages and because it acted jointly with CTA and Board in rejecting PPA's messages.[15] *Adickes v. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); *Potenza v. Schoessling,* 541 F.2d 670, 671–72 (7th Cir.1976); *Tomkins v. Village of Tinley Park,* 566 F.Supp. 70, 74 (N.D.Ill.1983).

6. Public forums exist by either tradition or designation. *Perry Education Association v. Perry Local Education Association,* 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). Historically streets, sidewalks and parks have been recognized as traditional public forums for expressive conduct, *Hague v. CIO,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939), while "public property which the state has opened for use by the public as a place for expressive activity" constitutes a designated public forum for First Amendment purposes "even if [the state] was not required to create the forum in the first place." *Perry,* 103 S.Ct. at 955.

7. Other courts that have considered the public forum issue in the context of transit advertising have held that where, as here, a transit system has opened its message space to some forms of protected speech (that is, has created a public forum), the system may not refuse to accept other forms of protected speech. See *Impeach Nixon Committee v. Buck,* 498 F.2d 37, 38 (7th Cir.1974), *cert. granted,* 416 U.S. 978, 94 S.Ct. 2378, 40 L.Ed.2d 756 (1974), *remanded,* 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974) (dismissed as moot by the Seventh Circuit in unpublished order of

---

15. PPA argues Winston bears liability here whether viewed as CTA's agent or (as Winston strenuously urges) an independent contractor. No one has addressed Winston's appropriate categorization fully (including, for example, whether any considerations of nondelegable duty might impact its claimed independent con-

tractor status). Because it is clear injunctive relief properly runs against Winston however it is viewed (see Rule 65(d)), resolution of Winston's overall status can await the hearing on damages (if any were to be sought against Winston).

Dec. 5, 1979); *Coalition For Abortion Rights and Against Sterilization Abuse v. Niagara Frontier Transportation Authority*, 584 F.Supp. 985 (W.D.N.Y.1984) (unconstitutional to reject message promoting abortion); *Gay Activists Alliance of Washington, D.C., Inc. v. Washington Metropolitan Area Transit Authority*, Civ. No. 78–2217, slip op. at 9–11 (D.D.C. July 5, 1979) (unconstitutional to reject message stating "Someone in your life is Gay").

■ 8. CTA has created a public forum by opening its message space to a wide variety of protected speech, including political candidate messages, religious messages, messages by trade unions and other not-for-profit organizations and associations, other issue-oriented messages of various sorts and commercial messages of all sorts, all as detailed in Findings 8 and 21. See *McCreary v. Stone*, 575 F.Supp. 1112, 1123–25 (S.D.N.Y.1983).

9. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the only Supreme Court transit case, found message space on a public bus to be a nonpublic forum under the circumstances before the Court. In *Lehman* the transit authority (in sharp contrast to CTA here) had a 26-year written policy prohibiting acceptance of *all* political issue and political candidate messages, in compliance with which policy the transit authority had never accepted any political issue or political candidate messages. What the *Lehman* Court held was only that car card space on buses and trains was not a *traditional* public forum like "meeting halls, parks, street corners or other public thoroughfare" (*id.* 418 U.S. at 303, 94 S.Ct. at 2717), so a political candidate had no inherent right of access.

10. However, *Lehman*'s precedential value is limited to "unique fact situations" involving government-created forums (see *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 514 n. 19, 101 S.Ct. 2882, 2896 n. 19, 69 L.Ed.2d 800 (1981)). *Lehman* held (1) as a matter of *law* car card space on transit vehicles was not a *traditional*

public forum, and (2) as a matter of *fact* the Shaker Heights transit system had not been *designated* as a public forum. It did *not* hold that as a matter of *law* a transit system *could not be* designated as a public forum. Whether such designation has in fact occurred in this case is a matter this Court has resolved in the affirmative, for the reasons stated in these Findings and Conclusions. Accordingly *Lehman* neither forecloses nor indeed derogates from this Court's determination here. By contrast with the present case, the "unique fact situation" presented by *Lehman* was one in which a transit system had a long-standing consistently-applied written policy of not accepting any political messages or other messages involving protected speech.

11. *Lehman* is also inapplicable to bar the result reached here because:

(a) It does not at all address the issue whether a public transit system may permit some political speech while rejecting other political speech.

(b) CTA, unlike the Shaker Heights Transit System, has no "sharply defined criteria for determining whether to accept or reject advertisements dealing with controversial political and social issues." *Gay Activists Alliance.*

(c) CTA's prohibition of speech associated with the abortion issue is a selective exclusion of a particular subject of public import, rather than a blanket prohibition of all speech involving subjects of public import. *Id.*

(d) This Court holds there are no "essential differences between [PPA's] announcement and the other advertisements [allowed by CTA] as far as their [free-speech-exercising and potentially controversial] nature is concerned." *Impeach Nixon Committee*, 498 F.2d at 38.

■ 12. Once the state creates a public forum by designation and so long as it retains the open character of the facility, "it is bound by the same standards as apply in a traditional public forum." *Perry*, 103 S.Ct. at 955. *Accord, Widmar v. Vincent*, 454 U.S. 263, 267–70, 102 S.Ct. 269, 272–74, 70 L.Ed.2d 440 (1981) (when

university had opened its meeting facility to student groups, it could not exclude student religious groups); cf. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555–59, 95 S.Ct. 1239, 1244–46, 43 L.Ed.2d 448 (1975) (city could not exclude production of "Hair" from a municipal theatre without satisfying constitutional safeguards applicable to prior restraints). Only two types of restrictions on speech are allowed in a public forum: (a) content-neutral time, place or manner restrictions and (b) content-based regulations narrowly drawn to achieve a compelling state interest. *Perry*, 103 S.Ct. at 955.

■ 13. CTA has by its conduct created a public forum by designation in its message space (see Conclusion 8). Having done so, CTA has not denied PPA access to CTA message space because of a narrowly-tailored content-neutral time, place or manner restriction of the type that can be enforced in a public forum. CTA's restriction is unquestionably content-based. See *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972). CTA has violated PPA's First Amendment free speech rights by preventing PPA's access to that forum because of the content of PPA's speech and the nature of the speaker, even though CTA has attempted to exclude speeches on both sides of the issue.[16] *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 537–38, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980).

■ 14. CTA's reasons advanced as "justification" for its content-based regulation prohibiting abortion-related advertising are all predicated on predicted adverse reactions from persons with opposing views (see Finding 25). Wholly apart from the speculative (though possibly self-fulfilling) nature of those reasons (see Finding 26), they are not compelling state interests that justify restricting speech. As the Court said in *Terminiello v. Chicago*, 337

U.S. 1, 4–5, 69 S.Ct. 894, 895–896, 93 L.Ed. 1131 (1949):

Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, *Chaplinsky v. New Hampshire, supra* [315 U.S. 568] pp. 571–572 [62 S.Ct. 766, 768–769, 86 L.Ed. 1031], is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. See *Bridges v. California*, 314 U.S. 252, 262 [62 S.Ct. 190, 193, 86 L.Ed. 192]; *Craig v. Harney*, 331 U.S. 367, 373 [67 S.Ct. 1249, 1253, 91 L.Ed. 1546]. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

Accord, *Collin v. Smith*, 578 F.2d 1197, 1206 (7th Cir.), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978); and see the extended discussion in *NAACP Legal Defense & Educational Fund ["LDF"] v. Devine*, 727 F.2d 1247, 1261–64 (D.C.Cir. 1984) of the offensiveness to the First Amendment of succumbing to what the late Professor Harry Kalven, Jr. termed the "heckler's veto."

■ 15. Such restriction based on content of the speech to avoid offense to the listeners is permissible only—if at all—in clearly defined circumstances such as "when the speaker intrudes on the privacy of the home, or a captive audience cannot practically avoid exposure." *Collin*, 578

---

**16.** PPA's messages clearly constitute protected speech. *Carey v. Population Services International*, 431 U.S. 678, 687, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977); *Bigelow v. Virginia*, 421 U.S. 809, 821–25, 95 S.Ct. 2222, 2232–34, 44 L.Ed.2d 600 (1975).

F.2d at 1206. CTA argues *Lehman* establishes people on buses are in fact a "captive audience." But that argument reads *Lehman* too broadly. *Lehman* rather decided that under the facts before the Court the buses were not public forums (see Conclusions 9–10). *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209–10 n. 5, 95 S.Ct. 2268, 2273 n. 5, 45 L.Ed.2d 125 (1975). In the course of that decision several Justices noted the "degree of captivity" of persons on the buses was greater than that of the person on a public street (*id.*).

16. What of the "captive audience" doctrine in this case? As *Erznoznik* teaches (422 U.S. at 212, 95 S.Ct. at 2274, quoting *Redrup v. New York*, 386 U.S. 767, 769, 87 S.Ct. 1414, 1415, 18 L.Ed.2d 515 (1967)) it must be shown the medium is "so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it." Although transit facilities are more cramped and restricted than public streets, CTA has certainly not shown its medium of advertising makes it *impossible* for an unwilling individual to avert his eyes (contrast, for example, the passengers' inability to escape messages delivered by loudspeakers on transit vehicles dealt with in *Public Utilities Commission v. Pollak*, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952)).[17] CTA cannot justify its content-based regulation on the basis of the "captive audience" doctrine. It is of course not impossible for CTA riders to avert their eyes from the printed message PPA seeks to deliver.[18]

17. Indeed the result in this action would be the same even if (contrary to the facts in this case) CTA facilities, buses and trains were not public forums. Exclusion of PPA's messages is arbitrary and capricious and does not reasonably advance the intended purpose of CTA facilities. *Perry*, 103 S.Ct. at 957; *Lehman*, 418 U.S. at 304, 94 S.Ct. at 2717; *NAACP LDF*, 727 F.2d at 1257. CTA's purported justification for rejecting PPA's messages—that CTA rejects all "controversial" messages— is belied by CTA's acceptance of various messages that are unquestionably "controversial" (it is unnecessary to weigh the comparative "controversiality" of issues in the balance). Moreover, as *NAACP LDF*, 727 F.2d at 1261–64 teaches, such exclusion from even a non-public forum based upon mere speculation as to the disruption CTA facilities would undergo is unwarranted. In summary on this independent alternative ground for decision:

(a) CTA has provided no credible evidence that its purported policy of "no controversial issues" advances the intended purpose of CTA facilities, for it accepts advertising on controversial issues other than abortion.

(b) CTA's exclusion of abortion-related advertising is based solely on unsupported speculation as to the disruption of its facilities.

18. Deprivation of First Amendment freedoms, even for a short time, constitutes irreparable harm justifying injunctive relief. *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). PPA has no adequate remedy at law for the violation of its First Amendment rights by exclusion of its messages from CTA vehicles. Accordingly PPA is entitled to injunctive relief against defendants' violation of its First Amendment rights.[19]

\*     \*     \*

---

**17.** CTA's argument that its riders are a "captive audience" is disingenuous at best, given its lack of concern about a host of other issues that clearly are (or in some instances could be) offensive to substantial groups of people (see Findings 8 and 21). See *Erznoznik*, 422 U.S. at 210, 95 S.Ct. at 2273.

**18.** This should not be misread as a holding on whether CTA might constitutionally apply the same rationale to highly graphic depictions (see nn. 13 and 14).

**19.** PPA also complains of the unevenness of the CTA's policy, barring abortion-related speech while accepting other "controversial" messages, breaches PPA's rights to equal protection of the laws. That contention may well have force, but it is unnecessary to decide the issue for current purposes. And the same is true of PPA's claims under 42 U.S.C. §§ 1985(3) and 1986.

Based upon the foregoing Findings and Conclusions, this Court hereby orders that judgment be entered in favor of PPA and against all defendants:

1. declaring unconstitutional CTA's policy and practice of preventing PPA's messages from appearing on CTA vehicles and premises because such messages relate· or refer to the subject of abortion and public debate regarding abortion; and

2. permanently enjoining all defendants and their respective officers, agents and employees, and all other persons in active concert or participation with any of the foregoing persons who receive actual notice of this order by personal service or otherwise, from refusing to sell or lease to PPA display space for its messages in or upon CTA buses and trains and other CTA property at public service rates normally charged not-for-profit organizations.

If PPA desires entry of any additional order conforming to the Findings and Conclusions, it is directed to tender its proposed order to this Court (with copies of course to defendants' counsel).