**PLANNED PARENTHOOD ASSOCIATION/CHICAGO AREA, an Illinois not-for-profit corporation, Plaintiff-Appellee,**

v.

**CHICAGO TRANSIT AUTHORITY, et al., Defendants-Appellants.**

No. 84-2518.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 25, 1985.

Decided July 12, 1985.

As Amended July 18, 1985.

Richard W. Burke, Burke, Griffin, Chomicz & Wienke, Chicago, Ill., for defendants-appellants.

Alan S. Gilbert, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiff-appellee.

Before BAUER and ESCHBACH, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

ESCHBACH, Circuit Judge.

Planned Parenthood Association/Chicago Area ("PPA") brought this action under 42 U.S.C. §§ 1983, 1985(3), and 1986 against the Chicago Transit Authority and numerous individual defendants[1] (collectively, "CTA"), alleging that CTA's refusal to rent space in its advertising system to PPA violates PPA's rights under the First and Fourteenth Amendments of the United States Constitution. The district court, finding the CTA advertising system had become a public forum, agreed and granted a permanent injunction enjoining CTA from refusing to sell advertising space to PPA. The district court reserved the issue of damages for later resolution.

On appeal from the grant of injunctive relief, CTA argues that several of the district court's factual findings are clearly erroneous, and that its legal conclusions are flawed. We have jurisdiction under 28 U.S.C. § 1292(a)(1). We now affirm.

I.

The facts of this case, as found by the district court, are reported in *Planned Parenthood Association v. Chicago Transit Authority*, 592 F.Supp. 544 (N.D.Ill.1984), and will not be repeated in their entirety here. CTA maintains advertising space on its property throughout Chicago. This space includes car cards on the interiors of buses and transit trains. Winston Network, Inc. ("Winston") has an exclusive contract with CTA to accept and place cards, signs, and other forms of advertising in available CTA advertising space. Under the contract, Winston may not accept "immoral, vulgar, or disreputable advertisements"; otherwise, no restriction is placed on Winston's acceptance of messages.

Winston, on behalf of CTA, accepts a wide variety of commercial, political-candidate, public-service, and public-issue advertising. While commercial and political-candidate advertisers pay full rate, non-profit organizations may have their message posted on CTA property for only a nominal fee that covers CTA's costs in placing the ads.[2] Winston does not seek approval from CTA before accepting full-rate advertising, except in the infrequent instances where it believes an ad raises questions of vulgarity or legality. On the other hand, Winston often seeks approval for ads from non-profit organizations. Jack Sullivan, Winston's liaison with CTA, testified that he forwards proposed non-profit ads to CTA when the non-profit organization is, in his view, not an "established" organization, or when he thinks the content of the proposed ad is controversial. Sullivan bases these determinations on his own judgment.

In 1983 and 1984, PPA, a not-for-profit organization that provides a variety of family-planning services, repeatedly sought advertising space in CTA buses and transit cars. PPA's first proposed ad mentioned the availability of family-planning services. Sullivan forwarded the ad to CTA, where PPA's request for advertising space was denied. PPA continued to request advertising space, and submitted a second proposed ad. The second ad mentioned the availability of counseling about "prenatal care, abortion, or adoption." CTA officials again decided that permission to display the ad should be denied.

PPA then brought this action pursuant to 42 U.S.C. §§ 1983, 1985(3) and 1986 charging that CTA's refusal to accept PPA's message violated PPA's rights under the First and Fourteenth Amendments. CTA in its answer claimed that it had rejected PPA's messages by applying its "long-standing, consistently-enforced policy ... to reject controversial public issue advertisements."

1. Additional defendants include CTA's governing body, the Chicago Transit Board, members of that Board, CTA's Executive Director Bernard J. Ford, and former CTA Public Affairs Director Michael Horowitz.

2. PPA has at all times expressed its willingness to pay full rates. CTA has stated that it would not accept PPA's proposed ad even at the higher rate.

After a bench trial,[3] the district court found that CTA had no such policy, and that the purported policy had been contrived for this action. Further, the court found that if there was a policy of rejecting controversial public-issue ads, it was neither consistently enforced nor applied to any issue except abortion. It also found that CTA's response to ads on the issue of abortion had been sporadic. For instance, CTA had in the past accepted and posted messages from other family-planning organizations, including the Illinois Family Planning Council, a not-for-profit organization that provides funds to PPA. CTA also accepts and posts messages for hospitals and medical clinics without ascertaining whether they offer abortion-related services.[4] CTA made no effort to determine what abortion-related services PPA offered before rejecting its ad. Indeed, PPA's first proposed message was rejected despite the fact that it did not mention the word "abortion." Nor did CTA know when it rejected PPA's ads whether PPA referred persons for abortions or performed abortions.[5] Finally, the court rejected as unsupported by the record CTA's assertion that acceptance of "abortion-related" messages would cause administrative disruption, protests, and loss of revenue.

The court concluded that CTA had created a public forum

> by opening its message space to a wide variety of protected speech, including political candidate messages, religious messages, messages by trade unions and other not-for-profit organizations and associations, and other issue-oriented messages of various sorts and commercial messages of all sorts....

592 F.Supp. at 553. The court then concluded that CTA's rejection of PPA's message was not a permissible time, place, or manner restriction, but an impermissible rejection based on the content of the message and the identity of the speaker. Finally, the court concluded that the result would be the same even if the CTA facilities were not public fora, because exclusion of PPA's message was "arbitrary and capricious and [did] not reasonably advance the intended purpose of CTA facilities." Id. at 555. Accordingly, the court entered an order declaring CTA's refusal of message space to PPA unconstitutional and permanently enjoining CTA from refusing to lease PPA space for its messages.[6]

## II.

CTA challenges three of the district court's factual findings: (1) that CTA has previously accepted "controversial public-issue advertising," (2) that CTA has no policy against accepting such advertising, and (3) that CTA's expressed reasons for rejecting abortion-related advertising are unfounded and speculative. Before we examine CTA's contentions, we first consider our standard of review.

### A. Standard of Review

Although CTA recognizes that appellate review of factual findings is governed by Fed.R.Civ.P. 52(a), it suggests two reasons why that rule's "clearly erroneous" standard should not control here.

First, CTA notes that the Supreme Court has repeatedly held that in cases raising First Amendment issues, an appellate court has an obligation to "make an independent examination of the whole record," New York Times v. Sullivan, 376

---

3. By agreement of the parties, in accordance with Fed.R.Civ.P. 65(a)(2), trial of this action on the merits was advanced and consolidated with the hearing on PPA's application for injunctive relief.

4. For instance, Winston accepted and posted ads for the Albany Women's Clinic, a facility that provides abortions. The ads were later removed after CTA received letters opposing the posting of the ads by members of pro-life groups.

5. In fact, at the time PPA's messages were rejected, PPA did not perform abortions, although it now does so.

6. Because of its resolution of PPA's First Amendment claim, the district court did not reach PPA's claim that CTA's refusal violated the Equal Protection Clause, nor did it discuss relief under 42 U.S.C. §§ 1985(3) and 1986.

U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964) (quoting *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)), including independent review of the trier of fact's findings in support of the judgment. *See , also NAACP v. Claiborne Hardware,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1983); *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). However, the presence of a First Amendment issue in a case does not, in and of itself, trigger the rule of independent review of the factual findings of the lower court. The rule's purpose is to assure "that the judgment does not constitute a forbidden intrusion into the field of free expression." *New York Times, supra,* 376 U.S. at 285, 84 S.Ct. at 729. The Supreme Court's recent discussion of the interplay between Rule 52(a) and the doctrine of independent review in *Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), convinces us that the independent review doctrine is inapplicable to this case.

In *Bose,* the Supreme Court reaffirmed the need for closer scrutiny of certain factual findings "in cases involving restrictions on the freedom of speech protected by the First Amendment, particularly in those cases in which it is contended that the communication in issue is within one of the few classes of 'unprotected' speech," *id.* at 1961, such as fighting words, obscenity, incitement to riot, or libel. In each of those cases, the Court noted, "the limits of the unprotected category, as well as the unprotected character of the particular communications, have been determined by the judicial evaluation of certain facts that have been deemed to have constitutional significance." *Id.* at 1962. Independent appellate review of such facts assures that the suppression of protected speech—particularly unpopular or controversial speech—is not insulated from close scrutiny by the straightforward application of the clearly-erroneous rule. The rule thus reflects a special solicitude for claims that the protections afforded by the First Amendment have been unduly abridged.

CTA is not before this court claiming abridgement of its First Amendment rights. Its claim is, rather, that its proprietary interest in excluding PPA's message from its trains and buses has been wrongly restricted. The doctrine of independent review has never been thought to afford special protection for the government's claim that it has been wrongly prevented from restricting speech. Accordingly, we do not agree with CTA that the district court's factual findings should be subjected to a more exacting standard of review than the standard of Rule 52(a).

CTA also argues that, insofar as the district court's factual findings are based on documentary evidence, they are subject to a less deferential standard of review. While we have stated before that our "discretion within the 'clearly erroneous' standard is slightly broader" in a case where the district court relies in part on documentary evidence, *Clark v. Universal Builders, Inc.,* 706 F.2d 204, 206 (7th Cir.1983), this view has recently been discredited by the Supreme Court, *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (theory that appellate court can conduct more stringent review of factual findings based on documentary evidence cannot be traced to the text of Rule 52).

We thus turn to an examination of the disputed findings of the district court.

### B. Controversial Public-Issue Advertising

■ The district court found that CTA had no policy of rejecting "controversial public-issue advertising" and had in fact accepted such advertising in the past. CTA contests both of these findings.

We first consider whether a finding that CTA maintained a policy of rejecting controversial public-issue advertising would help CTA. We are immediately confronted with the problem of defining CTA's policy. CTA admittedly accepts public-issue advertising; it is only the subset of "controversial" public-issue advertising that it claims to decline under its policy. CTA

maintains no written standards to guide those who must apply this controversiality bar. All those who testified for CTA stated that they judged whether a proposed ad should be rejected as controversial subjectively. As CTA describes its policy, then, it is to reject those proposed messages discussing public issues that CTA officials subjectively believe to be controversial.

We question whether a regulation of speech that has as its touchstone a government official's subjective view that the speech is "controversial" could ever pass constitutional muster. *Cf. Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 546, 100 S.Ct. 2326, 2338, 65 L.Ed.2d 319 (1980) (Stevens, J., concurring); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975); *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). Nevertheless, this case does not require that we decide that question, for we cannot find the district court's findings clearly erroneous.

CTA challenges the finding that it had no consistently-enforced policy of rejecting controversial public-issue advertising primarily by noting that it had in the past twice rejected proposed ads (other than abortion-related ads). In 1966, CTA refused to post an anti-Vietnam war ad, although it eventually posted the ad as part of a settlement agreement. Again in 1974, CTA refused to post "Impeach Nixon" placards until ordered to do so by this court. *Impeach Nixon Committee v. Buck*, 498 F.2d 37 (7th Cir.), *vacated and remanded*, 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974) (dismissed as moot by this court by unpublished order, December 5, 1974).

We do not agree with CTA that these two incidents show that CTA's policy is long-standing and consistently enforced. CTA's policy, as described by CTA officials, is unwritten, and indeed, at least one CTA Board member had never heard of the policy before this case. Its application de-

pends on a series of events that can only be described as whimsical. First, the proposed ad must strike CTA's Winston liaison as "controversial." The Winston official must then send the ad to CTA, where a new official must agree. None of this screening occurs, however, unless the advertiser requests not-for-profit rates. Ads for political candidates are not screened, for instance, no matter how controversial the issues advanced by the candidates or how hotly-contested the race, simply because political advertisers pay full rates. Nor are commercial ads screened for controversiality. Finally, there appears to be little agreement among CTA officials about what subjects would be banned by the controversiality policy, or indeed, what subjects are controversial.[7]

As might be expected, the operation of the above-described "policy" has not resulted in the exclusion of all controversial public-issue advertising. CTA's arguments to show the incorrectness of the district court's conclusions that certain ads that had appeared in CTA cars and buses were controversial in the same sense as PPA's proposed ad only illustrate the vagaries of CTA's purported policy. For instance, one ad, sponsored by a group named "8th Day Center for Justice," shows large bombs falling on a small child, who is releasing a dove with an olive branch in its beak. The text of the ad is a quotation from President Eisenhower, stating "Every gun that is made, every warship launched, every rocket fired signifies in the final sense, a theft from those who hunger and are not fed, those who are cold and are not clothed." The district court characterized this ad as an arms control message by an "anti-war group." CTA argues that this finding was clear error, as "none of the advertisements [in evidence] below mentions war...." CTA Br. at 16. We agree with the district court that the ad could be considered an arms control or anti-war ad; in fact, we are at a loss as to how else to describe it.[8] We

---

7. All CTA officials agree that the issue of abortion is controversial.

8. The district court also found that CTA has posted, among others, ads concerning discrimination in employment, gun registration laws,

do not find that the court below erred in finding that CTA had accepted other controversial public-issue advertisements.

### C. CTA's Justifications for Rejecting PPA's Message

CTA claimed below that it was justified in rejecting all abortion-related advertising because such advertising "would cause administrative disruption, discomfort to riders, protests, loss of revenues and other adverse effects....", 592 F.Supp. at 551. The district court found that CTA's evidence on those issues was "entirely speculative" and could not be credited. CTA argues that this finding is clearly erroneous.

As evidence in support of its predictions, CTA cites letters it has received from members of the public that state opposition to the posting of abortion-related messages on CTA facilities. While these letters support CTA's claim that some members of the public will be made uncomfortable if CTA accepts "abortion-related advertisements," they do not render the district court's finding clearly erroneous.[9] The district court based its finding on testimony by officials at public transit systems in other large cities that no adverse effects had been noted from such advertising in their cities. We do not believe that the district court clearly erred in crediting the actual experience of other transit officials and discrediting the predictions and expectations of CTA officials.

### III.

The district court concluded that the CTA advertising system had become a public forum by designation. Alternatively, the court held that CTA's refusal to accept PPA's message was unconstitutional even if CTA had not created a forum for public expression. CTA challenges both conclusions.

### A. The Public Forum

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). In *Perry*, the Court outlined a scheme of analysis for issues involving access to public property for expressive purposes, noting that public property could generally be divided into three categories for purposes of such analysis.

The first category is the traditional public forum, public property that has been devoted to expressive activity "by long tradition or by government fiat." *Id.* at 954. The quintessential example of such property is the public streets and parks, which citizens have used for expressive purposes "time out of mind." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939); *see also United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (public places historically associated with free expression are considered without more to be public fora). The parties agree that the CTA is not a traditional public forum.

The second and more amorphous category includes public property "which the state has opened for use by the public as a place for expressive activity." *Perry* at 955. Such property, referred to by the Court as a public forum by designation, may be opened generally for all expressive activity, as the municipal auditorium in *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), appears to have been, or may be opened only for certain expressive purposes, *City of Madison Joint School Dis-*

---

and registration for the draft. CTA argues that these ads could not be considered controversial, because they were posted at the request of various governmental bodies and they inform citizens about the law. We cannot agree with CTA that the official source of these advertisements makes their subject matter less controversial.

**9.** Many of the letter writers do not identify themselves as riders on the CTA system, but only as members of pro-life groups opposed to any advertisements related to abortion.

trict v. Wisconsin Public Employment Relations Comm'n, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (discussions of school board business), or for use only by certain groups, Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university facilities open for use only by student groups). The final category, of course, is public property that has not become a public forum.

■ If public property is a public forum, either traditionally or by designation, the government bears a heavy burden in justifying restrictions on speech therein:

> For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . . The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

Perry, supra, at 955 (citations omitted). On the other hand, if the property has not become a public forum, the government is entitled to reserve the property for its intended purposes, "communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Id.

■ Perry does not clearly establish guidelines for determining when government property has become a designated public forum. While it is apparent that opening government-owned property for indiscriminate use by the public would suffice, id. at 955, it is also clear that property is not necessarily a nonforum if such indiscriminate access is not allowed. See, e.g., City of Madison Joint School District, supra; Ysleta Federation of Teachers v. Ysleta Independent School District, 720 F.2d 1429 (5th Cir.1983). In analyzing whether government property has become a public forum, courts have found it helpful to consider the uses to which the property has previously been put, see, e.g., Widmar

v. Vincent, 454 U.S. 263, 268, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981); Jarman v. Williams, 753 F.2d 76, 79 (8th Cir.1985); Lebron v. Washington Metropolitan Area Transit Authority, 749 F.2d 893, 894 (D.C. Cir.1984); International Society for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Authority, 691 F.2d 155, 160 (3d Cir.1982), as well as whether the proposed speech is inconsistent or incompatible with the primary use of the government facility, see, e.g., Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States, 708 F.2d 760, 773 (D.C.Cir. 1983); Eastern Connecticut Citizens Action Group v. Powers, 723 F.2d 1050, 1054 (2d Cir.1983).

### B. CTA Facilities

■ Applying these considerations to the facts here, we agree with the district court that the CTA advertising system has become a public forum. As discussed earlier, CTA maintains no system of control over the advertisements it accepts for posting on its system other than the general contractual directive to Winston to refuse vulgar, immoral, or disreputable advertising. Access to CTA's advertising system, then, is virtually guaranteed to anyone willing to pay the fee. In accordance with this laissez-faire policy, CTA has allowed its advertising space to be used for a wide variety of commercial, public-service, public-issue, and political ads. See Lebron v. Washington Metropolitan Area Transit Authority, 749 F.2d 893, 896 n. 6 (1984) (acceptance of political advertising made subway system public forum); Penthouse International, Ltd. v. Koch, 599 F.Supp. 1338, 1349 (S.D.N.Y.1984) (same). Moreover, since CTA already permits its facilities to be used for public-issue and political advertising, it cannot argue that such use is incompatible with the primary use of the facilities.

CTA's reliance on Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), is misplaced.

In that case, a candidate for political office sought to place ads on the interior of Shaker Heights buses. Shaker Heights had a consistently-enforced written policy of rejecting all political and public-issue advertising, and in its twenty-six years of operation, the transit system had not permitted any political or public-issue advertising on its vehicles. *Id.* at 301, 94 S.Ct. at 2716. The Court upheld the city's "managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising," noting that the "city has consciously limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing on a captive audience." *Id.* at 304, 94 S.Ct. at 2718.[10]

While *Lehman* stands for the proposition that the interior of a transit system's cars and buses is not a traditional public forum, it does not stand for the proposition that such space may never become a public forum. Rather, the Court upheld the blanket exclusion of an entire class of potentially controversial speech. We are not confronted in this case with a policy of exclusion comparable to the one found in *Lehman.* On the contrary, we are confronted with no policy at all. Moreover, CTA has accepted political and public-issue advertising. Accordingly, *Lehman* is not controlling.

CTA does not attempt to justify its exclusion of PPA's message as a narrowly-tailored, content-neutral time, place, or manner restriction. *See Consolidated Edison v. Public Service Commission,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980) (a constitutionally-permissible time, place, or manner restriction may not be based on either the content or subject matter of speech). Nor does it attempt to show that its rejection of PPA's message is "necessary to serve a compelling state interest...." *Perry, supra,* 103 S.Ct. at 955. Accordingly, we affirm the district court's conclusion that CTA's rejection of PPA's message is impermissible.[11] In light of our agreement with the district court's conclusion that CTA's advertising system has become a public forum, we need not consider the court's alternative holding that CTA's exclusion of PPA's message would be impermissible even if the CTA system were not such a forum.

### IV.

The district court made the following finding of fact:

> In refusing to sell or lease PPA space for its display cards, CTA acted in knowing and intentional or reckless disregard of the constitutional rights of both PPA and the potential viewers of PPA's display cards.

CTA argues that this finding is defective as a basis for assessing damages against CTA or any of the named defendants in this action.

We agree with CTA that the finding is mysterious. A finding in a civil rights action that a defendant acted with knowing and intentional or reckless disregard for a plaintiff's constitutional rights is ordinarily relevant only to the issue of punitive damages. *See Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). The finding quoted above is directed only at CTA. The Chicago Transit Authority is a municipal corporation, and as a general rule, local public entities are immune from punitive damage awards in civil

---

**10.** A plurality of the Court found no public forum had been created by Shaker Heights's acceptance of commercial and public-service advertising. Justice Douglas, concurring, based his opinion upon his belief that petitioner had no constitutional right to present his views to the "captive audience" on the buses.

**11.** CTA in its reply brief argues that its rejection of PPA's message is justified by its desire to protect the captive audience of bus and train riders. We doubt that the captive audience doctrine can properly be used to allow government censorship of one *topic. See Erznoznik v. City of Jacksonville,* 422 U.S. 205, 208–09, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975) (First Amendment strictly limits government's power "selectively to shield the public from some kinds of speech on the ground that they are more offensive than others"), at least without a stronger showing than CTA has made here.

rights actions. *See City of Newport v. Fact Concerts,* 453 U.S. 247 (1981); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1270 (7th Cir.1984).[12] The district court might have meant "CTA" to refer to all of the defendants in the action. If this were true, however, the finding is conclusory: it is devoid of subsidiary findings that would establish the requisite state of mind for each of the individuals.

Our discussion of this point is academic, however. CTA does not appeal from a final judgment; the issue of damages remains to be litigated. *See Western Geophysical Company of America, Inc. v. Bolt Associates, Inc.,* 463 F.2d 101 (2d Cir.), *cert. denied,* 409 U.S. 1040, 93 S.Ct. 523, 34 L.Ed.2d 489 (1972) (judgment determining liability but not fixing damages not final under 28 U.S.C. § 1291). Our jurisdiction over this appeal is based on 28 U.S.C. § 1292(a)(1), which authorizes immediate appeal from orders granting or denying injunctions. The challenged finding has nothing to do with the issue of the appropriateness of the injunctive relief ordered by the district court; it goes only to the issue of damages. While lack of jurisdiction does not bar us from considering questions going only to the issue of damages, *see* 9 J. Moore, Moore's Federal Practice ¶ 110.25[1] (1985), we have previously noted the "strong judicial policy ... against allowing piecemeal appeals through the review" of otherwise unappealable questions in the course of reviewing substantively unrelated interlocutory appeals. *Alexander v. Chicago Park District,* 709 F.2d 463, 470 (7th Cir.1983); *see also Helene Curtis Industries, Inc. v. Church and Dwight Co.,* 560 F.2d 1325, 1335 (7th Cir.1977), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). CTA will be able to obtain review of the district court's findings and conclusions as they relate to damages after a final judgment is entered in the case. Thus we decline to consider questions relating to damages at this point.

**12.** However, a local government entity's "immunity from damages, including liability for punitive damages, may be waived by federal or state law." *Bell,* 746 F.2d at 1271. *See Kolar v.*

### V.

For the reasons expressed above, the order of the district court is affirmed.

AFFIRMED.

*County of Sangamon,* 756 F.2d 564, 567 (7th Cir.1985) (finding immunity of Illinois county waived by statute).