**CHILDREN OF THE ROSARY; Katherine A. Sabelko; Arizona Civil Liberties Union, Plaintiffs–Appellants,**

v.

**CITY OF PHOENIX; Richard C. Thomas, in his official capacity as Public Transit Director for the City of Phoenix; Neal Manske, in his official capacity as Deputy Director, Phoenix Transit Department, City of Phoenix; Transportation Displays, Inc. Defendants–Appellees,**

and

**ATC/Vancom Management Services, Inc., Defendant.**

No. 97–16821.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1998.

Decided Aug. 28, 1998.

Jay Alan Sekulow, The American Center for Law and Justice, Washington, DC; Benjamin W. Bull, The American Center for Law and Justice, Scottsdale, Arizona; James Weinstein, College of Law, Arizona State University, Tempe, Arizona; Nicholas S. Hentoff, Hentoff Law Offices, Phoenix, Arizona, for the plaintiffs-appellants.

Donald O. Loeb, Campana, Vieh, Shore, Owens & Loeb, P.C., Scottsdale, Arizona, for the defendants-appellees.

Before: WHITE,* Associate Justice, (Ret.), NOONAN and THOMAS, Circuit Judges.

Opinion by Justice WHITE; Dissent by Judge NOONAN.

WHITE, Associate Justice (Ret.):

The issue presented in this appeal is whether there is a likelihood that limiting advertising on municipal buses to "speech which proposes a commercial transaction" violates the First Amendment. We hold that there is not a sufficient likelihood of a constitutional violation to justify the grant of a

---

* The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

preliminary injunction and affirm the district court.

## I

The city of Phoenix sells advertising space on the exterior panels of its buses for the purpose of raising revenue. Prior to November 1, 1996, the city's advertising standards prohibited advertising "support[ing] or oppos[ing] a candidate, issue or cause, or which advocates or opposes a religion, ... or belief." Pursuant to this standard, the city rejected an advertisement submitted by plaintiff-appellant Children of the Rosary (COR) in September 1995. The proposed advertisement stated:

"Before I formed you in the womb, I knew you"—God

Jeremiah 1:5

### CHOOSE LIFE!

[COR Logo] Children of the Rosary

The COR logo is a fetus surrounded by a rosary, which is connected to a cross at the top. On October 10, 1995, COR sued the city and obtained an injunction preventing the city from enforcing the standard against COR and requiring the city to display the COR advertisement.

On November 1, 1996, new advertising standards took effect. The new standards limited the subject matter of bus advertising to "speech which proposes a commercial transaction." On November 15, 1996, the city advised COR that its advertisement would not be displayed because the advertisement did not propose a commercial transaction. In response, COR submitted a revised advertisement for display on the exterior bus panels. The revised advertisement stated:

"Before I formed you in the womb, I knew you"—God

Jeremiah 1:5

Purchase this message as a bumpersticker for your vehicle!

Contact [phone number]

[COR Logo] Children of the Rosary CHOOSE LIFE!

The city rejected COR's revised advertisement because, in the city's view, the primary purpose of the advertisement was not to propose a commercial transaction, but instead promote a noncommercial message.

Subsequently, plaintiff-appellant Arizona Civil Liberties Union (AzCLU) submitted its own advertisement for display on buses. Their advertisement stated:

The ACLU Supports Free
Speech for Everyone

To purchase this bumper sticker
please call [phone number]

The city rejected this advertisement because it did not comply with the new advertising standard.

On January 23, 1997, appellants filed suit against the city under 42 U.S.C. § 1983 in the United States District Court for the District of Arizona alleging that the city's advertising standards violated the First Amendment.[1] On August 1, 1997, the district court denied appellants' application for a preliminary injunction. This appeal followed.

## II

■ We have jurisdiction under 28 U.S.C. § 1292(a)(1). To obtain a preliminary injunction, a movant must show a likelihood of success on the merits and the possibility of irreparable injury or the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor. See Foti v. City of Menlo Park, 146 F.3d 629, 634 (9th Cir.1998).

■ We review the denial of a preliminary injunction for abuse of discretion, and will find an abuse of discretion "where the dis-

---

1. In addition to the city of Phoenix, appellants sued Richard C. Thomas, the city's Public Transit Director, Neal Manske, Deputy Director of the transit department, ATC/Vancom Management Services, Inc., a corporation that manages the transit system under a contract with the city, and Transportation Displays, Inc., a corporation that administers the placement of advertising on city buses in compliance with city standards. For convenience, we refer to the defendants collectively as the "city."

trict court 'based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Roe v. Anderson,* 134 F.3d 1400, 1402 (9th Cir.1998) (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)); *see MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 516 (9th Cir.1993).

To prove a violation of 42 U.S.C. § 1983, appellants must establish that 1) the city acted under color of state law; and 2) the city deprived appellants of a right secured by the Constitution or laws of the United States. *See Fred Meyer, Inc. v. Casey,* 67 F.3d 1412, 1413 (9th Cir.1995).

### III

There are three primary issues we must address in determining whether the district court applied the correct First Amendment framework. First, we must properly classify the advertising panels under the Supreme Court's "forum approach" for assessing the validity of restrictions on the use of government property. *See International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (ISKCON). Second, once we determine the type of forum at issue, we ascertain the relevant level of scrutiny for this forum. Finally, we must determine whether the city improperly applied this standard in rejecting the advertisements submitted by appellants.

### A

■ The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Forum analysis divides government property into three categories: public fora, designated public fora, and nonpublic fora. A traditional public forum is a place "that has traditionally been available for public expression," such as a public park. *ISKCON,* 505 U.S. at 678, 112 S.Ct. 2701.

Neither party argues that a bus advertising panel is a traditional public forum. Instead, the parties debate whether the bus panel is a designated public forum or a nonpublic forum.

■ A designated public forum is a nontraditional forum that the government has opened for expressive activity by part or all of the public. *See Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46 & n. 7, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The creation of a designated public forum requires a decision "intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439; *see Arkansas Educational Television Comm'n v. Forbes,* —— U.S. ——, ——, 118 S.Ct. 1633, 1641, 140 L.Ed.2d 875 (1998) (*AETC*). Hence, the Court has looked to the policy and practice of the government, the nature of the property and its compatibility with expressive activity, and whether the forum was designed and dedicated to expressive activities in determining if the government created a designated public forum. *See Cornelius,* 473 U.S. at 802–03, 105 S.Ct. 3439; *AETC,* —— U.S. at ——, 118 S.Ct. at 1641.

In defining the relevant forum, the Court has "focused on the access sought by the speaker." *Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439. In this case, we agree with the district court that the relevant forum at issue is the exterior advertising spaces on the city's buses.

■ Appellants contend that the city created a designated public forum by opening up the exterior panels on buses for advertising by the general public. However, a review of the city's standards and practices indicates that the city has not opened a public forum. The city has consistently restricted political and religious advertising. *See* Excerpts of Record at 22 (affidavit of Public Transit Director). Although under its prior policy the city did accept some noncommercial advertising, such as public service announcements, only one percent of the advertisements displayed on the exterior of buses were noncommercial. *See* Excerpts of Record at 22 (affidavit of Public Transit Di-

rector). The city submits that its current ban on noncommercial advertising supports a finding that the advertising panels are non-public fora.

The Supreme Court's decision in *Lehman v. Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), strongly supports our conclusion that the advertising panels are nonpublic fora. In *Lehman*, the Court upheld a ban on political advertising on public transit vehicles. The plurality opinion squarely rejected the argument that the advertising space on buses constituted a public forum protected by the First Amendment. *Id.* at 301–02, 94 S.Ct. 2714. The Court noted that the city was engaged in commerce and had "discretion to develop and make reasonable choices concerning the type of advertising" it would display. *Id.* at 303, 94 S.Ct. 2714. In our view, *Lehman* undermines appellants' claim that if a city has opened a property for communication, the property becomes a designated public forum. *See Perry*, 460 U.S. at 49 n. 9, 103 S.Ct. 948 (noting that *United States Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981), reaffirmed *Lehman's* rationale for rejecting the argument that because an instrumentality is used for communication of ideas, it becomes a public forum).

However, appellants suggest *Lehman* is not persuasive authority. They assert that *Lehman* only concerns advertising *inside* a bus because Justice Douglas, who supplied the fifth vote for upholding the ban, based his concurrence on the fact that commuters were a "captive audience" who would be forced to view a partisan political message. This interpretation of his concurrence is far from clear. In Justice Douglas's view, the right of commuters to be free from forced intrusions on their privacy "preclude[d]" the city from transforming its buses into "forums for the dissemination of ideas upon this captive audience." 418 U.S. at 307, 94 S.Ct. 2714. The reference to "captive audience" arguably suggests Justice Douglas was referencing commuters inside a bus. However,

read in context, his concern about forcing messages on a captive audience applies to observers on the street and commuters inside a bus. Justice Douglas wrote:

I agree with Mr. Justice Brandeis who ... said that the visual message in streetcars is no different [from other forms of communication imposed on a captive audience], for "[a]dvertisements of this sort are constantly before the eyes of observers on the streets and in street cars to be seen without the exercise of choice or volition on their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer.... The radio can be turned off, but not so the billboard or street car placard."

418 U.S. at 307–08, 94 S.Ct. 2714 (quoting *Packer Corp. v. Utah*, 285 U.S. 105, 110, 52 S.Ct. 273, 76 L.Ed. 643 (1932)). We reject appellants' invitation to narrowly interpret *Lehman*.[2]

Appellants also argue that we should not rely on *Lehman* because it was decided prior to the Supreme Court's adoption of its current approach to forum analysis in *Perry*. They claim that *Lehman* is inconsistent with subsequent Supreme Court decisions and provides little support for finding that the panels are nonpublic fora. We reject this argument. The Court relied upon and reaffirmed *Lehman's* rationale in *Perry* and subsequent cases, and there is no suggestion in the Court's jurisprudence that the advertising panels are properly classified as designated fora. *See, e.g., Perry*, 460 U.S. at 47, 103 S.Ct. 948 (relying on restriction upheld in *Lehman* to support the proposition that selective access does not transform government property into a public forum); *ISKCON*, 505 U.S. at 678, 112 S.Ct. 2701 (*Lehman* reflects forum-based analysis and supports proposition that lower level of scrutiny applies when government acts as a proprietor); *Cornelius*, 473 U.S. at 803–04, 806, 808–09, 105 S.Ct. 3439 (relying on *Lehman* to support, *inter alia*, propositions that "[n]ot every instrumentality used for communication ... is a

2. Appellants also claim that the issue presented in *Lehman* was limited to advertising inside transit vehicles. However, their claim is contradicted by Justice Brennan's dissent, which stated that the petitioner was denied access to exterior and interior advertising space pursuant to the city's prohibition on political advertising, 418 U.S. at 320 n.12, 94 S.Ct. 2714.

traditional public forum or a public forum by designation," and that a speaker may be excluded from a nonpublic forum if he wishes to address a topic not within the purpose of the forum); *United States v. Kokinda,* 497 U.S. 720, 725–26, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion) (extensively quoting from *Lehman* and noting the lower level of scrutiny applied to the ban on political advertising); *id.* at 737, 110 S.Ct. 3115 (relying on *Lehman* as stating the Court's "usual test for reasonableness" in a nonpublic forum); *R.A.V. v. St. Paul,* 505 U.S. 377, 390 n. 6, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (*Lehman* supports conclusion that there is "room" for "reasonable and viewpoint-neutral content-based discrimination in nonpublic forums"); *see also Lebron v. National R.R. Passenger Corp.,* 69 F.3d 650, 657 n. 3 (2d Cir.1995), *cert. denied,* 517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996) (rejecting the same argument presented by appellants in this case and noting that "the Supreme Court has repeatedly reaffirmed a broader reading of *Lehman,* often specifically citing to the plurality opinion").

Thus, *Lehman* provides sufficient authority for concluding that the bus advertising panels are nonpublic fora. Our conclusion is also consistent with the reasoning of other circuits. *See Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.,* 767 F.2d 1225 (7th Cir.1985); *New York Magazine v. Metropolitan Transportation Authority,* 136 F.3d 123 (2d Cir.1998); *see also Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth.,* 148 F.3d 242 (3d Cir.1998). In *Planned Parenthood,* the Seventh Circuit concluded that advertising space on a bus system became a public forum where the transit authority permitted advertising on "a wide variety of commercial, public-service, public-issue, and political ads." 767 F.2d at 1232. The court distinguished *Lehman* because *Lehman* "upheld the blanket exclusion of an entire class of potentially controversial speech," while in *Planned Parenthood* the transit authority promulgated "no policy at all" with respect to the acceptance of advertising. 767 F.2d at 1233; *see Christ's Bride Ministries, Inc.,* 148 F.3d at 254–55, 256–57 (distinguishing *Lehman*

where transit authority promulgated no policy governing removal of advertisements).

Similarly, in *New York Magazine,* the Second Circuit concluded that advertising space on the outside of buses was a public forum where the transit authority permitted "political and other non-commercial advertising generally." 136 F.3d at 130. The court found that the transit authority could not reject an advertisement based on a regulatory interest in upholding a law prohibiting the use of a person's name without their consent. *Id.* The court distinguished *Lehman* by arguing that

> disallowing political speech, and allowing commercial speech only, indicates that making money is the main goal. Allowing political speech, conversely, evidences a general intent to open a space for discourse, and a deliberate acceptance of the possibility of clashes of opinion and controversy that the Court in *Lehman* recognized as inconsistent with sound commercial practice.

*Id.*

This case is easily distinguished from the decisions of the Second and Seventh Circuits because the city of Phoenix consistently promulgates and enforces policies restricting advertising on its buses to commercial advertising. The city has not designated the advertising space on the exterior of its buses as a place for general discourse, and we therefore do not back away from our conclusion that the advertising space is a nonpublic forum.

## B

 In a nonpublic forum, the government has the "right to make distinctions in access on the basis of subject matter and speaker identity," *Perry,* 460 U.S. at 49, 103 S.Ct. 948, but "must not [make distinctions] based on the speaker's viewpoint," *AETC,* ——— U.S. at ———, 118 S.Ct. at 1643. "The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves." *Perry,* 460 U.S. at 49, 103 S.Ct. 948. The advertising standards "need only be reasonable; [they] need not be the most reasonable

or the only reasonable limitation." *ISKCON*, 505 U.S. at 683, 112 S.Ct. 2701 (internal quotations omitted). In addition, "[w]here the government is acting as a proprietor ... its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." *ISKCON*, 505 U.S. at 678, 112 S.Ct. 2701 (citing *Lehman* and noting that the Court upheld the political advertisement ban "even though the city permitted other types of advertising" on the buses); *see Kokinda*, 497 U.S. at 726, 110 S.Ct. 3115 (action of government acting in proprietary capacity is valid "unless it is unreasonable, or, as was said in *Lehman*, 'arbitrary, capricious, or invidious.' ").

■ The city sets forth four interests justifying the limitation on noncommercial speech: 1) maintaining a position of neutrality on political and religious issues; 2) a fear that buses and passengers could be subject to violence if advertising is not restricted; 3) preventing a reduction in income earned from selling advertising space because commercial advertisers would be dissuaded "from using the same forum commonly used by those wishing to communicate primarily political or religious messages;" and 4) a concern that allowing COR's advertisement would violate the Establishment Clause. *See* Answer ¶ 6.10. The district court concluded that each of the first three interests sufficiently supported the reasonableness of the revised standard. The court declined to address the Establishment Clause issue.

We agree with the district court that any one of the three interests supports the reasonableness of the city's standard. The city's interests in protecting revenue and maintaining neutrality on political and religious issues are especially strong. The *Lehman* court recognized that:

> [r]evenue earned from long-term commercial advertising could be jeopardized by a requirement that short-term candidacy or issue-oriented advertisements be displayed on car cards. Users would be subjected to

the blare of political propaganda. There could be lurking doubts about favoritism, and sticky administrative problems might arise in parceling out limited space to eager politicians. In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation. Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.

> . . . .

> The city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. These are reasonable legislative objectives advanced by the city in a proprietary capacity.

*Lehman*, 418 U.S. at 304, 94 S.Ct. 2714; *see Cornelius*, 473 U.S. at 809, 105 S.Ct. 3439 ("avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum"); *Lebron*, 69 F.3d at 658 (upholding reasonableness of policy rejecting displays favoring any political view).

Appellants recognize that the plurality in *Lehman* "stated that the exclusion of noncommercial speech was justified by the city's asserted interest" in protecting its advertising revenue. Appellants' Opening Brief at 33. However, they argue that *Lehman's* low level of scrutiny is no longer valid in light of subsequent Supreme Court decisions. As we discussed in concluding that the panels were nonpublic fora, there is little authority to support this argument. We conclude that the city's ban on noncommercial advertising is reasonable in light of the interests asserted by the city.[3]

---

**3.** Appellants' argument that *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), prohibits favoring commercial speech over noncommercial speech in bus advertising is rebutted by *Metromedia's* recognition that *Lehman* presented exactly that situation, and the Court's statement that it upheld the policy in *Lehman* Because it involved a factual situation different from the regulation of billboards. *Metromedia*, 453 U.S. at 514 n.19, 101 S.Ct. 2882 (plurality opinion).

C

The standard may still violate the First Amendment if it discriminates on the basis of viewpoint. *Cornelius,* 473 U.S. at 811, 105 S.Ct. 3439. We must determine whether the city's standard is a permissible subject matter restriction or impermissible viewpoint discrimination, a distinction that "is not a precise one." *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 831, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Viewpoint discrimination is a form of content discrimination in which "the government targets not subject matter, but particular views taken by speakers on a subject." *Id.* at 829, 115 S.Ct. 2510; *see General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 281 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998).

Appellants first argue that even though the standard may have the facial appearance of neutrality, the standard is unconstitutional because the intent of the policy is to exclude religious and political speech. But we are dealing here with a nonpublic forum. The First Amendment does not prohibit the government from imposing content-based exclusions, as long as such are reasonable, which is the case here. Two of the reasonable exclusions are political and religious speakers in order to maintain neutrality. It is argued, however, that "[a]lthough the new Policy has abandoned the previous policy's language, it has not abandoned its goal." Appellants' Opening Brief at 23. The city certainly intended to reject political and religious speakers. But motive is not dispositive when there is no indication that the city is implementing the standard in a viewpoint discriminatory manner that reflects an intent to use the policy to exclude disfavored perspectives on the issues.

The city's previous attempt at restricting access to the forum was struck down because it prohibited the expression of religious perspectives on issues while possibly permitting others to express their perspective. The city responded by enacting a general standard regulating access to the forum. The city's current standard does not use political or religious controversy as the test for accepting advertising, but instead implements a neutral standard based on its desire to avoid jeopardizing revenue and the city's neutrality. *See Lehman,* 418 U.S. at 304, 94 S.Ct. 2714 (limiting advertising to commercial advertising that is generally "innocuous and less controversial" does not violate the First Amendment); *Lebron,* 69 F.3d at 658–59.

Of course, a regulation that "is in reality a facade for viewpoint-based discrimination" is unconstitutional. *Cornelius,* 473 U.S. at 811, 105 S.Ct. 3439. But "[a] facade for viewpoint discrimination ... requires discrimination behind the facade." *Grossbaum v. Indianapolis Marion County Bldg. Auth.,* 100 F.3d 1287, 1298 (7th Cir.1996). In *Cornelius,* the Court was concerned that a government ban on "advocacy groups" in a charity drive concealed a bias against a viewpoint expressed by an excluded group. The government argued that the advocacy organization was excluded from a government charity campaign based in part on the government's interest in limiting participation to groups providing direct services to indigent persons. However, the Court remanded the case because there was evidence that other organizations who did not provide direct services to the poor participated in the campaign, thus raising the possibility that the organization was excluded because of its viewpoint.

We do not have similar evidence in this case. Although the city has continued to honor pre-existing contracts involving noncommercial advertisements to avoid breach of contract claims, including the display of a COR advertisement, the city has not accepted new noncommercial advertisements. The district court carefully reviewed the details of each contract and advertisement proffered by appellants as evidence of discrimination, and concluded that the standard was not a facade for viewpoint discrimination. We find no error in the district court's findings that the noncommercial contracts were effective prior to the adoption of the new standard and that advertisements accepted after the standard took effect were commercial in nature.

We also reject appellants' argument, based on *R.A.V. v. St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), that the standard discriminates in practice against a view-

point because it favors one side in a debate on public issues. *R.A.V.* struck down a criminal law that, among other things, prohibited displays that used certain words that would arouse anger in others on the basis of race, color, creed, religion, or gender. However, the law permitted displays containing the same words if the display did not invoke race or other classifications. Here, appellants do not explain how the city's standard prohibits one side of a debate from employing certain language or methods to express its view, while permitting the other side to use the same methods. Or, as the Court put it in *R.A.V.*, the city is not permitting "one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." 505 U.S. at 392, 112 S.Ct. 2538. Moreover, as compared to the applicable level of scrutiny when the government acts as a proprietor, the level of scrutiny is higher when the government is using its sovereign power to impose criminal penalties to deprive citizens of their liberty for expressing certain views.

■■ Appellants claim that the standard might permit an advertisement for a family planning clinic that offers abortion services while barring messages opposing abortion, thus favoring one side of a debate. However, the city is merely requiring that an advertisement convey a commercial message. As in *Lehman*, the city is acting to prevent its advertising panels from becoming areas for the debate of political and religious issues with a resulting detrimental effect on the city's ability to attract long-term commercial advertising. "In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation." *Lehman*, 418 U.S. at 304, 94 S.Ct. 2714.

## D

■■ Appellants also bring an as applied challenge, claiming that the city's rejections of their revised advertisements were viewpoint-based. The district court rejected the challenge, finding that the advertisements were "ideological communications" and the essential issue-oriented nature of the advertisements could not be changed to commercial advertisements by simply adding an offer to purchase a bumpersticker containing a political or religious message. We agree with the district court.

As an initial matter, we note that if appellants' challenge is successful, the reasoning of *Lehman* is hollow because a political advertising restriction could easily be avoided by tacking on a commercial offer to purchase the political message. For example, any candidate for political office could convert his political advertisement into a commercial advertisement by simply offering the message as a bumpersticker. This would significantly undermine the government's ability to act as a proprietor and control access to a nonpublic forum, thereby forcing the government into "an all-or-nothing choice" where "it might not open the property at all." *AETC*, —— U.S. at ——, 118 S.Ct. at 1642.

The Court addressed a similar attempt to transform speech in *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). The petitioner in *Valentine* attempted to evade a restriction on commercial advertising by placing a protest against a city law on the back of a handbill containing a commercial advertisement. The Court rejected this attempt to convert a commercial advertisement into a public protest, concluding:

> that the affixing of the protest against official conduct to the advertising circular was with the intent, and for the purpose, of evading the prohibition of the ordinance. If that evasion were successful, every merchant who desires to broadcast advertising leaflets in the streets need only append a civic appeal, or a moral platitude, to achieve immunity from the law's command.

316 U.S. at 55, 62 S.Ct. 920. Although *Valentine's* holding that the First Amendment does not protect commercial advertising has not survived, *see Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 420–21, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Court has continued to reject attempts to evade a regulation by appending a message aimed at transforming the speech.

In *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the Court rejected another attempt to transform speech by combining commercial and noncommercial elements. The prohibition at issue in *Fox* banned the operation of commercial enterprises on state university campuses. Students challenged the prohibition on First Amendment grounds because they were unable to host "Tupperware parties" to sell housewares. According to the students, the parties included presentations on "how to be financially responsible and how to run an efficient home." 492 U.S. at 474, 109 S.Ct. 3028. Thus, the students asserted, the commercial and noncommercial speech were "inextricably intertwined" and must therefore be classified as commercial speech. The Court stated that the "level of First Amendment scrutiny must depend upon the nature of the speech taken as a whole and the effect of [any] compelled statement thereon." 492 U.S. at 474, 109 S.Ct. 3028 (internal quotations omitted). The Court concluded that including the "home economics elements" did not convert the events into educational speech.

■ The district court did not err in finding that the proposed advertisements were noncommercial and the city did not engage in impermissible viewpoint discrimination. The Court has recognized that "there are commonsense differences between speech that does no more than propose a commercial transaction and other varieties." *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (internal quotations omitted); *see Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 562, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). In this case, the advertisements are not "expression[s] related solely to the economic interests of the speaker and its audience," *Central Hudson*, 447 U.S. at 561, 100 S.Ct. 2343, but instead seek to blur the distinction between types of speech by blending an "ideological communication," *Virginia Bd. of Pharmacy*, 425 U.S. at 779, 96 S.Ct. 1817 (Stewart, J., concurring), with an offer to purchase the message. When the government is acting as a proprietor in this nonpublic forum, the government may regulate this nonpublic forum by rejecting an advertisement combining political and religious advertisements with a commercial offer. The city did not apply the standard in a viewpoint discriminatory manner by rejecting appellants' advertisements promoting their views on public issues.

## IV

■ Appellants also argue with little elaboration that the standard is overbroad, underinclusive, and vague. Appellants claim that the standard is overbroad because its restrictions are greater than necessary to protect the city's interests. Appellants do not explain how the doctrine of overbreadth applies in this case. Indeed, they do not claim that the standard chills the speech of third parties or that others may not undertake to challenge the law. *See Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). Appellants fail to argue that there is "a realistic danger" of compromising the First Amendment rights of third parties and we find no merit in their facial overbreadth challenge. *See Jews for Jesus*, 482 U.S. at 574, 107 S.Ct. 2568 (internal quotations omitted).

■ We also reject appellants' assertion that the standard is underinclusive because it does not ban commercial speech containing religious or political elements. Appellants reliance on *City of Ladue v. Gilleo*, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), to support their argument is misplaced. *City of Ladue* stated that a regulation may be underinclusive where it attempts to give one side of a debate an advantage or where the government seeks to control "the search for political truth." 512 U.S. at 51, 114 S.Ct. 2038 (internal quotations omitted). Appellants do not argue in their underinclusive challenge that the city is giving an advantage to one side in a debate, and we rejected this argument in discussing whether the standard discriminates on the basis of viewpoint.

■ Finally, appellants argue that the standard is unconstitutionally vague in reliance on a concurring opinion in *Metromedia,*

453 U.S. at 536–37, 101 S.Ct. 2882, and a citation to that statement in *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 n. 19, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). They claim that the standard presents a danger of discrimination against disfavored subjects in the guise of determining what is commercial speech. Their brief vagueness argument makes it difficult to determine if they claim that the standard is vague because it presents a danger of viewpoint discrimination, or is vague because it "contains no standard for guidance as to prohibited and allowable conduct." *Major Media of the Southeast, Inc. v. City of Raleigh*, 792 F.2d 1269, 1272 (4th Cir.1986). To the extent appellants claim the standard is unconstitutional because of the discretion granted to the city, we reject this argument based on our discussion in previous sections.

If appellants are simply asserting that we should hold the standard unconstitutional because it is difficult to determine whether the "speech proposes a commercial transaction," we would reject the argument. First, we note that there is no fine or other penalty in this case if a person incorrectly classifies their advertisement: The city simply rejects the advertisement. This claim is unlike the usual vagueness challenge involving a fine or other sanction that has the potential to chill conduct. *Cf. Jews for Jesus*, 482 U.S. at 576, 107 S.Ct. 2568 (unrestrained power to arrest). Second, we agree with the Fourth Circuit that the Supreme Court has provided sufficient guidance on the meaning of the standard. *See Major Media*, 792 F.2d at 1272. The city's standard goes beyond stating that commercial speech is allowed; the city enacted the Court's standard for identifying commercial speech.[4] "[T]he test for identifying commercial speech" is whether the advertisement "propose[s] a commercial transaction." *Fox*, 492 U.S. at 473–74, 109 S.Ct. 3028. The Fourth Circuit was not persuaded that the possible difficulty of applying the Court's guidance in a marginal situation was sufficient to declare a policy unconstitutionally vague:

> Although an occasional marginal case might arise raising the question of whether on the particular facts the definition of commercial speech would be correct, such an infrequent possibility should not in itself justify a generalized charge that the ordinance itself is vague, given the guidance afforded by court decisions in the area.

*Major Media*, 792 F.2d at 1272–73. We agree with the Fourth Circuit and reject appellants' vagueness challenge.

## CONCLUSION

We AFFIRM the district court's denial of appellants' request for a preliminary injunction.

AFFIRMED.

NOONAN, Circuit Judge, dissenting.

That commercial speech can be distinguished from non-commercial speech, that the government as proprietor can limit a non-public forum to commercial speech so that the government makes money, and that the sides of buses in Phoenix are meant to be such a forum, are propositions I accept. They do not remedy discriminatory application of the ordinance by the City of Phoenix.

The ordinance restricts advertising to "speech which proposes a commercial transaction." At first blush, it looks as though the standard must be good because it incorporates a hint from a dictum of the Supreme Court: "[t]here are commonsense differences between speech that does 'no more than propose a commercial transaction,' . . . and other varieties." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,

---

**4.** Cf. *Foti v. City of Menlo Park*, 146 F.3d 629, 638–39 (9th Cir. 1998) (striking down on vagueness grounds a portion of an ordinance banning signs displayed on vehicles only when the vehicle has been parked in a manner designed to attract attention). The statute in Foti was facially invalid because it required police officers to determine whether the driver intended to park the car for the purpose of displaying a sign and provided no standard to guide their discretion. *Id.* at 639 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Here, by contrast, the city may only reject an advertisement if it fails to propose a legitimate commercial transaction, a standard which will leave it with relatively little discretion in accepting or rejecting advertisements for display.

425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (citation omitted). Advertisements for employment that do not express an opinion on social policy are "classic examples of commercial speech." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). An advertisement that expresses opinion and seeks financial support for a political movement is not commercial. *New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The distinction is tangible.

The distinction must be applied in the unique context of the medium of communication involved. Street car signs have been lumped with billboards as forming "a class by themselves." *Packer Corp. v. Utah*, 285 U.S. 105, 110, 52 S.Ct. 273, 76 L.Ed. 643 (1932) (Brandeis, J.); *see also Lehman v. City of Shaker Heights*, 418 U.S. 298, 307–08, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (Douglas, J., concurring, relying on Justice Brandeis's opinion in *Packer*). Experience, however, has shown each medium of communication to be unique. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). The medium here is the exterior panels of city buses. Such panels are large—not as big as big billboards but large enough so that figures on them are more than lifesize and the print on them shouts its message. Moving and grunting as they move, buses call attention to themselves. Stuck in traffic beside or behind a bus, the driver and passengers of a car cannot avoid taking in what confronts them. It is in their face. Similarly, pedestrians waiting for a light to turn cannot avert their eyes from what a waiting bus offers to view. The exterior panels are better than billboards in their ability to command consideration by those momentarily before them, and, unlike billboards, they move down central streets.

Not only is each medium of expression unique; the cultural context changes with the times. The context of a quarter of a century ago is not today's. We must apply precedents taking into account the context of contemporary culture. In this culture ideological conflicts exist in which the commercial side coincides with one of the two embattled positions. The commercial-non-commercial distinction should not be mechanically applied without attention to this distinct modern phenomenon.

As applied, the Phoenix ordinance bans a message that proposes a commercial transaction and, as an integral part of that proposal, identifies the product to be bought. What Children of the Rosary offers for sale is not something devised to evade the ordinance. As the record demonstrates, the bumpersticker was a good it sold prior to the ordinance's enactment. The American Civil Liberties Union offers a bumpersticker that, containing a message as to the ACLU's goals, effectively advertises the value of the ACLU as a participant in the community. A nonprofit organization may surely sell products incidental to its mission and thereby both promote its goals and help to support itself. It is hard to see why Phoenix rejected the ACLU ad—surely the message was uncontroversial—unless the city was trapped into maintaining a consistent position on bumperstickers. It may be, as the majority suggests, that the ordinance would be porous if the sale of bumperstickers is not barred; but that suggestion only shows the deficiency of the ordinance as applied and the difficulty of governmental restraint of speech.

It is something of an anomaly in First Amendment jurisprudence for more protection to be accorded commercial speech than is accorded noncommercial speech. As Justice White has observed, such a result "inverts" the normal rule. *Metromedia, Inc.*, 453 U.S. at 513, 101 S.Ct. 2882. If the inversion is permitted by precedent, it still must be done in a way that does not destroy the level playing field of politics or put the government's seal of approval on one of two sides of a political issue. Moneymaking is not government's primary business. It would be ironic if pursuit of profit permitted a unit of government to discriminate in the messages on government property.

Here, the message of a group acknowledging the sacredness of human life in the womb is rejected; Planned Parenthood could run an ad for an abortion clinic. The views clash; the city of Phoenix would give space to one and not the other. Analogously, if

Arizona should come to permit physician-assisted suicide as does Oregon, Dr. Kevorkian could advertise his services on the sides of the buses of Phoenix, but the counter advice of advocates offering free counselling against this course would be forbidden. The examples from the great life issues in our present culture speak for themselves. The clash over the environment affords other examples. A power company could extol its product. The Sierra Club, objecting to more dams, would be denied the forum. The makers of a pesticide could celebrate their wares; champions of pesticide-free farms would be barred. A developer could tout the quality of his homes; defenders of green space in the suburbs would have to be silent on the buses. The pornographer could advertise his shop; the defenders of neighborhood decency would be denied a reply. In the America of 1998 to give the commercial advertiser space, without reference to the product being pushed, is for a city to take sides more than occasionally on issues of life and health and energy and the ecosystem.

The case is further complicated by the likelihood of commercial media using the buses to advertise their products. The record indicates that the city of Phoenix is ready to accept such advertisements. Commercial media advertising can be full of political or religious content. In this way a radio station in Phoenix, like a station in San Francisco, could advertise on the buses that it broadcasts Rush Limbaugh with a photo of the man accompanying the sales pitch. A Christian radio station could promote its product with a cross and a relevant message. A movie house could announce the return of *The Last Temptation of Christ* with an illustration of the Magdalen.

If the city of Phoenix is to be truly neutral on political and religious issues, it must go beyond the simplicity of "commercial" and be specific as to the content of commercial messages it will not accept. The city may, for instance, specify that the buses will not carry commercial messages on hot topics—e.g., abortion, cigars and cigarettes, environmental disputes, euthanasia, pornography, radio talk shows, and X-rated movies. The city will have to discriminate frankly as to content, as it permissibly may in this commercial context. Such content-based restrictions are permissible in such nonpublic fora. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). What the city may not do is discriminate as to viewpoint, *Arkansas Educ. Television Comm'n v. Forbes*, —— U.S. ——, ——, 118 S.Ct. 1633, 1643, 140 L.Ed.2d 875 (1998), as it did in this case where in the course of applying its ordinance it effectively rewrote it to permit only "primarily commercial" messages and thereby froze out even commercial advertising by nonprofit groups without significant business transactions to advertise.

Of the three rationales for the city's policy, the avoidance of violence against the buses seems to border on the absurd; nothing in the record substantiates the fear. The other two rationales—neutrality on contentious political and religious matters and the maintenance of standards attractive to business advertisers—would both be served by the kind of precision suggested here as essential to constitutionality. Neither rationale is served by a policy that allows the ideology of one side but not the other to be smuggled in.

The Phoenix ordinance, as applied, discriminates against the appellants' commercial speech and the Phoenix ordinance, as applied, fails to mark off a realm of ideology-free speech from a realm where ideologues with businesses to advertise can flourish. The preliminary injunction should have been granted.