CHRISTEN, Circuit Judge,
dissenting:
The majority and I part ways at the starting line. In my view, the district court erred by concluding that King County created only a limited public forum. The County’s policy and practice unmistakably demonstrate an intent to create a designated public forum on its Metro bus exteriors. Accordingly, the First Amendment requires that the County’s decision to restrict SeaMAC’s speech must be necessary to serve a compelling state interest and narrowly drawn; in other words, it must survive strict scrutiny. This is not to pre-judge the outcome of the case. The safety of public transit systems is of paramount importance, and it may be that credible threats created a compelling state interest. But it also may be that the County inappropriately bowed to a “heckler’s veto” and suppressed speech that should have been protected. To faithfully apply our precedent to the actual facts established by the record, we should remand for the district court to determine in the first instance whether genuine issues of material fact exist under the appropriate level of scrutiny, i.e., whether the County’s safety concerns justified cancellation of the ad.
The outcome of this dispute hinges on whether the County created a designated public forum or a limited public forum. The essential question in differentiating between the types of fora is what the government intended at the time it opened the forum, not when it closed it. We must consider the government’s policy and practice to glean its intent. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).
I. Metro’s policy establishes the County’s intent to create a designated public forum.
A policy that makes government property “generally available to a certain class of *504 speakers” signals an intent to create a designated public forum, whereas a policy that “reserve[s] eligibility for access ... to a particular class of speakers, whose members must then, as individuals, obtain permission” signals an intent to create a limited public forum. Ark. Educ. Television Comm’n v. Forbes, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (internal quotation marks omitted). The operative inquiry in this case is not, as the majority suggests, whether Metro’s policy makes its buses generally available to all advertisements, but rather whether it makes its buses generally available to noncommercial, political advertisements. See id. at 680, 118 S.Ct. 1633 (“[Wjith the exception of traditional public fora, the government retains the choice of whether to .designate its property as a forum for specified classes of speakers.”).
Although Metro’s policy required all proposed ads to be screened, Metro had no standards, written or otherwise, to guide application of the subjective restriction on “objectionable” and “offensive” content contained in its “civility clauses.” This fact alone strongly suggests that the County created a designated public forum. See Hopper v. City of Pasco, 241 F.3d 1067, 1077 (9th Cir.2001) (“Standards for inclusion and exclusion in a limited public forum must be unambiguous and definite .... ” (alteration and internal quotation marks omitted)). Metro’s civility clauses are so broad and permit so much official discretion that they cannot validly serve a “selective” function for purposes of forum analysis. See Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (government scheme regulating competing uses of a public forum “may not delegate overly broad licensing discretion to a government official”); Planned Parenthood Ass’n/Chi. Area v. Chi. Transit Auth., 767 F.2d 1225, 1230 (7th Cir.1985) (“We question whether a regulation of speech that has as its touchstone a government official’s subjective view that the speech is ‘controversial’ could ever pass constitutional muster.”). What is even more troubling is that Metro’s guidelines actually invite a heckler’s veto by expressly authorizing the censorship of speech whenever it is “reasonably foreseeable” that there will be strong objections.[1]
The majority emphasizes that SeaMAC’s ad and the counter ads were “pending before the County at the same time” and “rejected ... ‘at the same time.’ ” To the contrary, the record is crystal clear that SeaMAC’s ad was approved by Titan, Metro officials, and the King County Executive. It was only after SeaMAC’s ad had been accepted and objections were received that the County reversed its decision and refused to run SeaMAC’s ad. When it made that decision, it also decided to reject the counter ads proffered in response to SeaMAC’s ad.
The County reversed its initial approval of SeaMAC’s ad because of continued negative publicity and angry responses. When the controversy began, the Metro Transit Police reviewed SeaMAC’s ad and settled on a “mid-range” plan to address any security issues it might cause. Met *505 ro’s general manager concurred in the po-[1] lice proposal, stating that it “looks like a good plan of action.” Only when the controversy failed to die down after a few days did the County change its tune. Whether the County had compelling reasons for reversing itself remains an open question.
Metro’s contract with Titan permitted Titan to sell ad space for almost any ad of a controversial or political nature, thereby demonstrating an intent to grant general, not selective, access. See Forbes, 523 U.S. at 679, 118 S.Ct. 1633. Metro’s patently subjective policy with respect to such ads — the subjective nature of which was clearly evidenced in the acceptance and subsequent rejection of SeaMAC’s ad— distinguishes this case from other transit agency cases addressing clear policies excluding political, religious, or noncommercial advertising. See, e.g., Lehman v. City of Shaker Heights, 418 U.S. 298, 299-300, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (ban on political advertising); Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg’l Transp. (SMART), 698 F.3d 885, 890-92 (6th Cir.2012) (same); Children of the Rosary v. City of Phoenix, 154 F.3d 972, 976-78 (9th Cir.1998) (ban on noncommercial advertising). The majority’s holding impermissibly allows the County to create a designated public forum for purposes of selling ad space, and then engage in discretionary, content-driven evaluation of speech on an ad hoc basis by invoking its infinitely amorphous “civility clauses.”
II. Metro’s consistent application of the policy establishes the County’s intent to create a designated public forum.
Even if Metro’s policy could be described as demonstrating an intent to create a limited forum, controlling case law would still require us to determine whether, in practice, Metro consistently enforced its civility clauses. See Hopper, 241 F.3d at 1075 (“[A]n abstract policy statement purporting to restrict access to a. forum is not enough. What matters' is what the government actually does — specifically, whether it consistently enforces the restrictions on use of the forum that it adopted.”). The history of Metro’s actual practices undeniably reveals an intent to create a designated public forum.
Metro’s advertising program project manager, who has worked for the County since 1985, declared that it was not “a goal of the [advertising program] to create an open forum for public debate,” but she tellingly acknowledged that Metro “has always accepted noncommercial advertising, including candidates for elected office, ballot measures, and ‘cause’ advertising.” See United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg’l Transit Auth., 163 F.3d 341, 355 (6th Cir.1998) (“[A] governmental entity may not avoid First Amendment scrutiny simply by declaring that it is not creating a public forum.... ”). The advertising program manager defined a “public issue” (“cause”) advertisement as one that “conveys ... a particularized message of a social, religious, ideological or philosophical nature,” “lacks a commercial purpose,” and therefore “is primarily public communication” (emphasis added). The advertising program manager also acknowledged that Metro “accepted noncommercial advertising generally ” (emphasis added). For example, in 2009 Metro ran a pro-atheism ad (‘TES, VIRGINIA ... THERE IS NO GOD”) that generated a large number of comments.
Metro’s actual history of accepting ads for a variety of political subjects, whether controversial or not, demonstrates that the County created a designated public forum. See DiLoreto v. Downey Unified Sch. Dist. *506 Bd. of Educ., 196 F.3d 958, 967 (9th Cir.1999) (distinguishing school district’s practice of excluding political, religious, or controversial public issue advertising from cases where “the city or transit authority controlling the bus sign advertisements historically accepted advertisements on a wide variety of subjects”); N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 130 (2d Cir.1998) (“Allowing political speech ... evidences a general intent to open a space for discourse.... ”); Planned Parenthood, 767 F.2d at 1232 (transit agency’s history of accepting political ads and wide variety of controversial public issue ads indicated intent to create public forum). In addition to its longstanding practice of generally accepting “cause” advertising, Metro approved three prior controversial ads specifically relating to the Middle East conflict. One ad, sponsored by the Arab American Community Coalition, stated “SAVE GAZA!” Another stated, “END SIEGE OF GAZA!” A third ad, sponsored by the Jewish Federation of Greater Seattle, stated “THOUSANDS HAVE FALLEN IN PURSUIT OF PEACE, Remember Israel’s soldiers and victims of terror. Join us in a moment of Silence on April 28 at 11:00 am.” The County’s attempt to distinguish the other ads related to the Middle East controversy boils down to the fact that the previous ads did not spark public outcry. If this is the most salient distinction, then it is plain that Metro’s civility clauses amount to a memorialization of a heckler’s veto and a content-driven suppression of speech.
The majority observes that Titan rejected proposed ads that did not comply with the contract. But the record does not support the majority’s assertion that such rejection was “routine,” and when ads were rejected, it was usually based on the policy’s separate and specific restriction on alcohol and tobacco content. Despite its supposedly selective screening process, it appears that Metro had rejected only one set of ads under the civility clauses prior to this case.
In 2009, pursuant to the civility clauses, Metro directed Titan to reject a proposed series of ads submitted by “Citizens for Home Safety.” These ads included language like “HATE CRIMES COMMITTED BY CULTS ARE DESTROYING THE USA” and “NAZI MEDICAL ABUSE COMMITTED FOR 15 YEARS: State Hate Committed by Elected Officials & Doctors.” The sponsors of this set of ads ended up withdrawing their application before it was formally denied. There is no evidence of Metro ever rejecting any other ad under the civility clauses in the 30-plus-year history of its advertising program. On the County’s motion for summary judgment, the district court should have weighed this single example against the ads Metro did accept, drawing all appropriate inferences in SeaMAC’s favor. Consideration of these ads tips the balance sharply toward the conclusion that the County created a designated public forum.
The argument that Metro’s advertising policy was consistently applied is also severely undermined by the undisputed facts leading up to the cancellation of the Sea-MAC ad. Metro’s advertising program manager initially approved the ad. It was then forwarded to Metro’s General Manager, who also approved it as consistent with Metro’s policy. Finally, the ad was sent to the King County Executive, who “recognized that [the ad] was potentially offensive to some of the community,” but “didn’t feel that it rose to the level of violating [Metro’s civility] policy.” In other words, it was approved at all levels in the County.
The County adhered to its opinion that the ad was compliant with Metro’s policy for a period of time even after a local *507 television news station ran a story about the ad that provoked complaints from the public. Only when the heckling became louder did the County reverse itself. Notably, the reversal came after the Metro Transit Police had reviewed the ad and adopted a mid-range security plan it considered sufficient to handle any potential disruptions.[2] One of the virtues of a consistently-applied rule is knowing how it will be applied in the future. If SeaMAC’s ad had actually run afoul of a consistently applied policy, as the majority opines, surely it would not have made it past three separate gatekeepers.
Perhaps recognizing that there is no actual track record of consistent application of the civility clauses, the majority argues that the court should “focus on the County’s enforcement of the policy as a whole, not just the specific provision invoked to exclude the ads at issue.” But the other policy restrictions were narrow and specific, and applying them did not require the County to look beyond the content of the ad. They prohibited the promotion or depiction of subjects like alcohol and tobacco, adult entertainment or services, sexual or excretory activities, and material that is false or defamatory. Allowing the County to piggyback its ambiguous disruption and civility standards on its consistent rejection of alcohol and tobacco ads opens a back door to official arbitrariness and a heckler’s veto. With regard to the civility clauses, the only consistent practice demonstrated by the record in this case is Metro’s historically consistent practice of allowing virtually any political ad. This well-established pattern “trump[s] the general rule that no public forum is created when the government requires speakers to obtain permission before engaging in expressive activity in the forum.” Hopper, 241 F.3d at 1077 (discussing Christ’s Bride Ministries, Inc. v. Se. Pa. Transp. Auth., 148 F.3d 242, 252-55 (3d Cir.1998)).
The Third Circuit’s opinion in Christ’s Bride is particularly instructive. There, a transit agency removed a poster that declared “Women Who Choose Abortion Suffer More & Deadlier Breast Cancer” after it received numerous complaints, including a letter from the Assistant Secretary of Health in the U.S. Department of Health and Human Services stating that the ad was misleading and inaccurate. 148 F.3d at 245-46. The transit authority’s policy restricted “libelous, slanderous, or obscene advertising,” and reserved the right to remove any advertising material that was later deemed “materially] objectionable.” Id. at 250-51. The transit agency claimed it had not created a public forum because its written policy retained for it the sole discretion to reject or remove ads it found objectionable. Id. at 251. But the Third Circuit begged to differ, noting the transit authority had accepted “a broad range of advertisements for display,” including two prior ads favoring reproductive rights. Id. at 251-52. Additionally, though the main purpose of the advertising program in Christ’s Bride was to generate revenue, the record showed a secondary goal of “promoting ‘awareness’ of social issues and ‘providing a catalyst for change.’ ” Id. at 249. Given the transit authority’s “prac *508 tice of permitting virtually unlimited access to the forum,” the Third Circuit ruled the transit authority had created a designated public forum. Id. at 252.
This cáse closely parallels Christ’s Bride. Like the transit authority there, Metro’s “written policies ... specifically provide for the exclusion of only a very narrow category of ads,” and Metro’s “goals of generating revenues through the sale of ad space” and its “practice of permitting virtually unlimited access to the forum” plainly establish that the County created a designated public forum. ■ Id. After litigation was initiated, Metro’s General Manager declared that “[i]t has never been a part of Metro’s mission to provide a forum for public debate, especially on non-transit issues,” but the record also includes a February 2009 email from a Titan representative that speaks volumes about the historic application of the policy. The representative was one of a handful of individuals responsible for responding to the controversy. The email, on which Metro’s advertising program manager was copied, succinctly explains that Metro’s restrictions “are there to allow the freedom and opportunity for all organizations and associations either political or non-profit to benefit from using transit as a form of advertising their ‘cause’ ” (emphasis added). Post-litigation declarations aside, Metro’s history of actually allowing virtually unfettered access to anyone willing to purchase advertising space on its bus exteriors establishes that the County intended to open its government property to public discourse, without the specific restrictions constitutive of a limited public forum.
III. The nature of the forum does not compel a contrary conclusion.
The purpose of a public bus system is to provide an efficient and orderly means of public transportation; unlike a public park, buses are not necessarily the type of government property traditionally used for expressive activity. But according to Metro’s advertising program manager, the predominant purpose of the advertising program Metro chose to create was to “generate revenue for Metro,” and Metro decided to accept “noncommercial advertising, including candidates for elected office, ballot measures, and ‘cause’ advertising.” See N.Y. Magazine, 136 F.3d at 130 (holding that because MTA generally accepted both commercial and political speech, the outside of MTA buses was a designated public forum).[3] There is nothing about selling ad space on the exterior of Metro buses that is inconsistent with the traditional use of Metro’s buses. Unlike judicial or municipal buildings where expressive activity could interióre with courtrooms or security, see, e.g., Sammartano v. First Judicial Dist. Ct., 303 F.3d 959, 966 (9th Cir.2002), the record here contains no evidence that allowing expres *509 sive activity interfered with Metro’s ability to operate as a transit authority. In fact, it appears Metro was able to maximize its ability to generate revenue to benefit the transit system by opening up its advertising program to noncommercial advertising.
I agree with the majority that the First Amendment does not require a “categorical rule” designating a public forum wherever the government has permitted some political speech. The County could have allowed political campaign advertising but not “cause” advertising, as many other transit agencies have chosen to do. But when a government entity decides to permit a “wide array of political and public-issue speech,” including controversial political advertising, it cannot escape the conclusion that it has opened the forum for such speech generally, and it may not close the forum, after the fact, to justify a content-based rejection of speech. See United Food, 163 F.3d at 355.
The majority’s view seems to be that the government may “elect[ ] to keep open” a designated public forum or a limited public forum for as long as it sees fit, and close such a forum “whenever it chooses.” I agree that outside of traditional public fora, the government may choose not to permit certain categories of speech on its property, but it must make that choice up front. The court’s opinion suggests the government may open and shut a forum, willy-nilly, in response to public uproar — a particularly dangerous precedent in light of modern technology. Emails, text messages, and tweets can zing through the airwaves to and from countless devices in a matter of seconds, generating scores of impetuous responses just as fast. Given today’s modern and often anonymous communication technology, public outcry can be frequent and fleeting. Granting the government license to close a forum it previously made open in response to such outcry confers broad power on hecklers to stamp out protected speech they find objectionable.
The First Amendment by no means puts the government in a straightjacket; an essential aspect of the designated public forum is that the government may adopt specific, consistently-applied limitations, such as permitting only commercial ads. But properly applied, First Amendment doctrine plays a fundamental role in restraining the government from picking and choosing which speech is “uncivil,” or from succumbing to a heckler’s veto. This was the logic behind well-reasoned decisions from other circuits like N.Y. Magazine, Planned Parenthood, and Christ’s Bride, ■¡with which this court professes accord, see Children of the Rosary, 154 F.3d at 978, but from which the majority opinion now distances itself.
Viewing the evidence in the light most favorable to SeaMAC, it is clear that even if Metro initially intended to limit access to its bus exteriors, it abandoned that intent by allowing ads on controversial subjects “as a ‘matter of course.’ ” Christ’s Bride, 148 F.3d at 254. Because we should remand for the district court apply strict scrutiny in the first instance, I respectfully dissent.

. In this case, many of the most vehement objections appear to have been expressed anonymously over the telephone or Internet. It requires little risk or effort to express threats and vitriol through such faceless and frequently traceless communications. To quote the popular Seattle hip-hop artist Mack-lemore: "Have you read the YouTube comments lately?” — it’s easy to hide "behind the keys of a message board” or similarly anonymous medium. I do not discount the possibility that Metro received credible threats, but whether the threats were credible is best left to law enforcement authorities; it is not relevant to what type of forum Metro created.

. The majority asserts the potential disruption "wasn't covered by the existing security protocol because, as Metro's Operations Manager stated, it represented 'a totally new and different situation that we [had not] confronted before.’ ” But Metro’s Operation Manager made this statement in the course of explaining that Metro did not have any pre-existing ''security plan for dealing with a disruption that had to do with a public demonstration of some sort that had to do with what was on a bus." Metro crafted a plan specifically for SeaMAC’s ad, which Metro's Operations Manager believed was sufficient to handle any potential disruptions.

. In American Freedom Defense Initiative v. Washington Metropolitan Area Transit Authority, 898 F.Supp.2d 73 (D.D.C.2012), the plaintiff contracted with the transit authority to display a similar ad to the counter-ad at issue here that said: "In any war between the civilized man and the savage, support the civilized man. Support Israel. Defeat Jihad.” Id. at 75. The transit authority indefinitely postponed the ad after a video disgracing the prophet Mohammed led to anti-American violence in several countries. Id. at 77. The district court noted that the D.C. Circuit previously held that the transit authority had converted its subway stations into public fora by accepting other political advertising. Id. at 79 n. 6 (citing Lebron v. Wash. Metro. Area Transit Auth., 749 F.2d 893, 896 (D.C.Cir.1984)). The district court, applying strict scrutiny, concluded that the transit authority’s concerns of passenger and employee safety were compelling, but the transit authority’s failure to consider alternatives "plus the open-ended and purely subjective duration of its postponement were not narrowly tailored as required.” Id. at 76.